## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| BROCK FREDIN, | |
| Plaintiff, | |
| --against-- | **DECLARATION OF BROCK FREDIN** |
| GRACE ELIZABETH MILLER,<br>CATHERINE SCHAEFER,<br>LINDSEY MIDDLECAMP,<br>DAVID MIDDLECAMP,<br>PETER MAYER,<br>DAVID GREEN,<br>DORSEY AND WHITNEY | Case No.  19-CV-3051 |
| Defendants. | |

STATE OF WISCONSIN     }
                                  ss:
COUNTY OF SAINT CROIX    }

BROCK FREDIN, being duly sworn, deposes and says:

1.     I am the Plaintiff in the above-captioned proceeding.   I submit this declaration in support of my opposition to Non-Dorsey Defendants Motion to Dismiss filed on April 6, 2020.   For the reasons stated herein and within my memorandum of law dated April 6, 2020, Defendants motion to dismiss should be denied in its entirety.

## **AUTHENTICATION OF DOCUMENTS**

2.     Attached hereto as **Exhibit A** is a true and correct copy of the January 24, 2017 email between Lindsey Middlecamp and Tara Patet.

3.      Attached hereto as **Exhibit B** is a true and correct copy of the July 17, 2018 hearing transcript with Grace Miller's testimony in *State v. Fredin*, Ramsey County District Court, Case No. 62-CR-17-3156.[1]

4.      Attached hereto as **Exhibit C** is a true and correct copy of the May 2018 and June 2019 police reports filed by Grace Miller to the Saint Paul Police Department.

Dated: April 6, 2020
Saint Croix County, WI

s/ Brock Fredin
Brock Fredin
Baldwin, WI
(612) 424-5512 (tel.)
brockfredinlegal@icloud.com
*Plaintiff, pro se*

---

[1] I am only providing the excerpt of Defendant Grace Miller's testimony.  The entire transcript would be thousands upon thousands of pages and cause undue burden.  If the Court wishes, I can include the entire transcript.  The transcripts alone likely cost the State of Minnesota or Ramsey County $10,000-20,000.



**From:** <span style="background:black;color:white">13.82</span>
<span style="background:black;color:white">13.82</span>

**To:** "tara.patet@ci.stpaul.mn.us" <tara.patet@ci.stpaul.mn.us>
**Subject:** RE: your counterpart at St. Paul?
**Date:** Tue, 24 Jan 2017 18:41:54 -0000
**Inline-Images:** image004.png; image001.png

---

Tara,

Thank you so much for such a prompt reply and I understand the challenges and frustrations with perps who are strategic in their contact.

**13.82**

Anyway—I just wanted to be a conduit for that **13.82** decision to make it to your office and make sure the recent contact gets considered. I do think she'll take comfort knowing that the investigator and your office have a consistent set of eyes on this guy.

**13.82**


Minneapolis
City of Lakes

**From:** Patet, Tara (CI-StPaul) [mailto:tara.patet@ci.stpaul.mn.us]
**Sent:** Tuesday, January 24, 2017 10:15 AM
**To:** Heng, Mary Ellen
**Cc:** McCabe, David (CI-StPaul)
**Subject:** RE: your counterpart at St. Paul?

i am familiar with this case, as are a couple other prosecutors in my office. As much as we want to get this guy, and as much as it is clear that he's intentionally trying to "get around" the HRO, we just haven't had a prosecutable case presented to us yet. What we have done, in partnership with SPPD Family Violence unit, is to have a single investigator appointed to the case(s) so that all are coming to one person and so that each time new behavior gets reported, the reviewing investigator and prosecutor are able to immediately see it in context with the larger body of conduct. I will forward your email on to the investigator as an FYI as well.

Thanks again, and have a great Tuesday.

**From:** Heng, Mary Ellen [mailto:MaryEllen.Heng@minneapolismn.gov]
**Sent:** Tuesday, January 24, 2017 10:06 AM
**To:** Patet, Tara (CI-StPaul)
**Subject:** FW: your counterpart at St. Paul?

Tara –

I am forwarding you this email from a colleague of mine who works in our civil division. She is friends with victim **13.82** I believe you reviewed a case involving **13.82** and Brock Fredin. **13.82** asked me to forward on her email and this case to you.

**From:** **13.82**
**Sent:** Tuesday, January 24, 2017 9:45 AM
**To:** Heng, Mary Ellen
**Subject:** your counterpart at St. Paul?

Mary Ellen,

Do you know/have contact info for your counterpart at the City of St. Paul? This is something of a professional courtesy email that, if you felt it was appropriate, I was hoping could be forwarded to their attention.

I have a friend who, in November of last year, got a restraining order against a man in St. Paul who stalked her for nearly two years even after she moved out of state all because she declined to meet him after brief contact on a dating site. He has retaliated against the restraining order in several dramatic ways; after storming out of the hearing at which it was granted, he promptly registered and launched a website referring to her by full name as a stalker and sexual predator and linking to her contact

**13.82**

MPD-9648000087

B



1   STATE OF MINNESOTA                      DISTRICT COURT

2   COUNTY OF RAMSEY                 SECOND JUDICIAL DISTRICT

3   ------------------------------------------------------------

4   STATE OF MINNESOTA,

5            Plaintiff,

6      vs.                          TRANSCRIPT OF PROCEEDINGS
                                         VOLUME II
7   BROCK WILLIAM FREDIN,

8            Defendant.

9   ------------------------------------------------------------

10           DISTRICT COURT FILE:  62-CR-17-3156

11  ------------------------------------------------------------

12      The above-entitled matter came on for hearing before

13  the HONORABLE SOPHIA Y. VUELO, Judge of Ramsey County

14  District Court, on July 17, 2018, in the Ramsey County Court

15  House, St. Paul, Minnesota.

16              *           *           *

17                     APPEARANCES

18      STEPHEN J. CHRISTIE, OFFICE OF THE SAINT PAUL CITY

19  ATTORNEY, 500 City Hall, 15 W. Kellogg Boulevard, St. Paul,

20  Minnesota 55102, appeared representing the Plaintiff.

21      CHRISTINA ZAUHAR, FIRM OF HALBERG CRIMINAL DEFENSE,

22  7900 Xerxes Avenue South, Suite 1700, Bloomington, Minnesota

23  55431, appeared representing the Defendant.

24

25      (Whereupon, the following proceedings were duly had.)

1                           I N D E X

2

3    Jury Selection (continues)                         125

4    Initial Comments by the Court                      176

5    Opening Statements by Mr. Christie                 183

6    Opening Statements by Ms. Zauhar                   189

7

8    WITNESS

9        Grace Miller

10           Direct Examination by Mr. Christie         203
             Cross-Examination by Ms Zauhar             275
11           Redirect Examination by Mr. Christie       304
             Recross-Examination by Ms. Zauhar          311
12
         Sgt. David McCabe
13
             Direct Examination by Mr. Christie         313
14           Cross-Examination by Ms. Zauhar            327

15   The State rests                                    330

16

17   EXHIBITS              Marked     Offered    Rec'd.

18   Exhibit 1               PM         229        229
     Exhibit 2               PM         242        242
19   Exhibit 3               PM         247        247
     Exhibit 4               PM         249        249
20   Exhibit 5               PM         255        255
     Exhibit 6               PM         256        256
21   Exhibit 7               PM         263        263
     Exhibit 8-10            PM         267        267
22   Exhibit 11              PM         324        324
     Exhibit 51              PM         284        284
23

24

25

                                                          —116—

                    RAMSEY COUNTY DISTRICT COURT

Filed in District Court
State of Minnesota
4/8/2019 4:26 PM

1    briefly and returned with the members of the jury.)

2           THE COURT:  Thank you.  You may be seated.

3        Welcome back from the lunch break.  At this

4    juncture, we will continue with this trial, and the

5    State will commence with their first witness.

6        Mr. Christie.

7           MR. CHRISTIE:  Thank you.  At this time, the

8    State would call to the stand Grace Miller.  May I go

9    to the hall?

10          THE COURT:  You certainly can.

11          (Whereupon, Mr. Christie left the courtroom

12   briefly and returned with the State's first witness.)

13          MR. CHRISTIE:  Ms. Miller, walk up to the

14   witness stand and remain standing, to be sworn.

15          THE COURT:  At this time, we will swear in

16   the witness.

17          THE CLERK:  Please raise your right hand.

18   You do swear or affirm that the testimony you give here

19   will be true, so help you God?

20          THE WITNESS:  Yes.

21          THE COURT:  Thank you, ma'am.  You may be

22   seated.  There is a microphone in front of you.  Feel

23   free to adjust it.  If you could speak into the

24   microphone, stating your first and last name, and spell

25   your last name for the record.

```
 1          THE WITNESS:  Grace Miller, M-I-L-L-E-R.

 2          THE COURT:  And, Ms. Miller, it does move

 3     very -- there you go.  It's very flexible, and so I

 4     want you to be comfortable as you speak.  Ms. Miller,

 5     I'm going to just remind you of some things to be

 6     mindful of.  If you could speak loud and clear, wait

 7     until the attorneys have asked their questions and then

 8     you may respond, and please avoid talking over one

 9     another.  Thank you.

10          Mr. Christie.

11                    DIRECT EXAMINATION

12     BY MR CHRISTIE:

13     Q   Good afternoon.

14     A   Good afternoon.

15     Q   So how old are?

16     A   I'm 33.

17     Q   And where did you grow up?

18     A   I grew up in a couple different places.  My dad was in

19         the military, but we settled in Wisconsin when I was

20         13.

21     Q   Okay.  And did you go to high school in Wisconsin?

22     A   Yes, I did, Boyceville, Wisconsin.

23     Q   And when you graduated from high school, what did you

24         do?

25     A   When I graduated from high school, I went to University
```

-204-

```
 1              of St. Thomas, here in St. Paul.

 2       Q      So tell us about your family.

 3       A      I lived with my mom, my dad, my two sisters -- older

 4              sister and younger sister.

 5       Q      Okay.  And what sort of things did you like to do as a

 6              family or do alone in terms of your interests and

 7              hobbies?

 8       A      We did a lot of outdoor stuff -- camping, liked

 9              horseback riding, and just stuff like that.

10       Q      Okay.  And you came to St. Paul to go to the University

11              of St. Thomas.  Did you have a particular course of

12              study in mind when you first started out?

13       A      Yeah.  I majored in geography and then later I also

14              picked up a major in English, and I was in the ROTC

15              program, preparing to be an officer in the Air Force.

16       Q      Okay.  And why did you decide to serve in the military?

17       A      Well, first, they offered -- they offered a full-ride

18              scholarship, and that was a very good deal.  But both

19              of my parents served in the military, and so I was used

20              to the lifestyle, I was comfortable with it, and it

21              seemed like it might have some good opportunities.

22       Q      Okay.  And so you got an undergraduate scholarship

23              through ROTC?

24       A      Yes.

25       Q      And did you complete your studies in St. Thomas within
```

205



1      four years, for an undergraduate degree?

2   A   Yes.

3   Q   Okay.  And as a part of the ROTC, were you in -- what

4      branch were you affiliated with?

5   A   Air Force.

6   Q   Okay.  And when you graduated undergraduate, what did

7      you decide to do next?

8   A   Well, I commissioned on the day that I graduated, and

9      my first duty station was McChord Air Force in Tacoma,

10      Washington, as an aircraft maintenance officer.

11  Q   Can you spell the name of that Air Force base for our

12      court reporter here?

13  A   I'm sorry, M-C-C-H-O-R-D.

14  Q   And that was out in Washington state?

15  A   Yes.

16  Q   And how long were you there?

17  A   Three years.

18  Q   And what sort of things did you do with that service?

19  A   I was an assistant officer charged with maintaining

20      C-17 aircraft.

21  Q   Okay.  And so after you finished your service out in

22      the state of Washington, what was the next step in your

23      career and education?

24  A   I was selected to teach in the Air Force Academy, which

25      comes with a -- basically, a scholarship to get your

62-CR-17-3156

CASE 0:19-cv-03051-SRN-HB   Document 88   Filed 04/06/20   Page 12 of 137   Filed in District Court
State of Minnesota
4/8/2019 4:26 PM

```
 1            master's degree, and so I got to go to Penn State
 2            University for a year and a half and get my master's.
 3    Q       So you were going to teach at the Air Force Academy in
 4            Colorado Springs --
 5    A       Yes.
 6    Q       -- out in Colorado?
 7    A       Yes.
 8    Q       But first you were going to get a degree out in
 9            Pennsylvania?
10    A       Yes.
11    Q       In English Literature?
12    A       Yes.
13    Q       And did you complete that graduate degree before you
14            went to the Air Force Academy?
15    A       Yes.
16    Q       And how long did you teach out at the Air Force
17            Academy?
18    A       Three and a half years.
19    Q       And what sort of subjects did you teach the cadets?
20    A       I taught freshman rhetoric and composition, sophomore
21            literature, a senior war literature and speech
22            communication class, and a majors course.
23    Q       Okay.  Did you enjoy it?
24    A       Yes.
25    Q       So after your three years at the Air Force Academy,
```

—207—

Filed in District Court
State of Minnesota
4/8/2019 4:26 PM

1        what did you do next?

2    A   I wanted to get my doctorate, and I couldn't do that

3        and stay on active duty.  So I resigned from active

4        duty and joined the reserves and came to Minnesota to

5        go to the University of Minnesota.

6    Q   While you were in the Air Force Reserves --

7    A   Yes.

8    Q   -- you were studying at the University of Minnesota for

9        Ph.D. or a doctorate?

10   A   Yes.

11   Q   Again, in English Literature?

12   A   Yes.

13   Q   So when did you start your graduate degree work at the

14       University of Minnesota?  What year?

15   A   Fall of 2014.

16   Q   Okay.  And how did you support yourself during that

17       time?

18   A   I had a teaching assistantship, which paid my tuition

19       and a small stipend, and I also got money from serving

20       in the Reserves on weekends.

21   Q   Did you live on or off campus?

22   A   On campus.

23   Q   Okay.  And are you still working on your Ph.D. in

24       English Literature?

25   A   Yes, I'm almost done.

1    Q    Okay.

2    A    I'm going to defend this fall, hopefully.

3    Q    Defend your thesis this fall?

4    A    Yes.

5    Q    But, meanwhile, you're in the Air Force Reserves?

6    A    Yes.

7    Q    And in the last four years, what sort of work did you

8         do for the Air Force Reserves here in the state of

9         Minnesota?

10   A    I started as a maintenance operations officer, and that

11        was just part-time.  And then I deployed to Kuwait for

12        six months, and when I returned, I became the aircraft

13        maintenance squadron commander.

14   Q    Okay.  And what's your current rank in the Air Force

15        Reserves?

16   A    I'm a major.

17   Q    Okay.  And back in the fall of 2015, what was your

18        rank?

19   A    I was a captain, then.

20   Q    Okay.  So you're working out at the guard out at the

21        airport, near Fort Snelling?

22   A    It's the Reserve Unit, yes.

23   Q    The Reserve Unit?

24   A    Uh-huh.

25   Q    And you're working on aircraft maintenance issues,

```
 1          correct?
 2    A     Yes.
 3    Q     But now you're in a command authority in the last few
 4          years?
 5    A     Yes.
 6    Q     How many people are under your command out there?
 7    A     It changes from day to day, but about 110.
 8    Q     110 under you -- your command out there?
 9    A     Yes.
10    Q     Working on airplanes, to make sure that they're working
11          properly?
12    A     Yes.
13    Q     Do you like your work?
14    A     Yes.
15    Q     Do you intend any sort of future career in the
16          military?
17    A     Yes.
18    Q     In what way?
19    A     I'm not sure yet.  The Air Force Academy is trying to
20          bring me back for a second tour, once I finish school.
21          I might also continue and command a squadron at a
22          different base at some point.
23    Q     Okay.  You're willing to move around the country or the
24          world in this group?
25    A     Yes.
```

1    Q    And what do you hope to do with your Ph.D. in English
2         Literature if you successfully defend your thesis?
3    A    The number one choice is to go back to the Air Force
4         Academy and teach, because it's kind of the best of --
5         the best of both worlds, I suppose.
6    Q    So it sounds like you're very busy with all of this
7         work and studies; is that fair to say?
8    A    Yes.
9    Q    Any time for a social life in the last three or four
10        years?
11   A    Sometimes.
12   Q    Okay.  And so what sort of things have you done to try
13        to get a social life outside of work and school?
14   A    I see my family quite a bit.  I didn't get to see them
15        when I was active-duty military because I didn't live
16        close enough, but now I can see them whenever I want.
17   Q    Okay.  And outside of family, have you tried to develop
18        any personal relationships?
19   A    Yes.
20   Q    In what way?
21   A    Well, I spend -- I used to spend time with the other
22        graduate students and sometimes the people from work
23        and, you know, online dating.
24   Q    Okay.  So when did you consider online dating, to try
25        to improve your social life?

—211—

```
 1    A    I tried it on and off for many years -- not just when I
 2         got here, but before that, even.
 3    Q    Okay.  And do a lot of your friends get involved in
 4         online dating and trying to meet people?
 5    A    Yes.
 6    Q    Okay.  So it's like it's more popular these days than
 7         it might have been 20 years ago?
 8    A    Yes.
 9    Q    And are there more than one type of online dating
10         platform or service?
11    A    Yes.
12    Q    Okay.  And is match.com one of those online dating
13         services?
14    A    Yes.
15    Q    And have you used match.com to try to find someone?
16    A    Yes.
17    Q    And when did you first join match.com?
18    A    Maybe a few years ago.  I honestly don't recall.
19    Q    Okay.  Now, when you started with match.com, did that
20         online dating service put you in touch with Brock
21         Fredin?
22    A    Yes.
23    Q    And he's the defendant in this case, right?
24    A    Yes.
25    Q    He's the gentleman sitting in the jacket across the
```

—212—

```
 1          table from me, correct?

 2     A    Yes.

 3     Q    And can you tell the jury, basically, how you met Mr.

 4          Fredin through match.com, for some of us who might not

 5          know how it works?

 6     A    There's just a -- there's an e-mail function, and he

 7          sent me a message one day.  I don't even remember what

 8          the first message said, but we talked back and forth

 9          for a little while, and then he asked to meet at some

10          point.

11     Q    Okay.  Well, let's back it up a little bit, for some of

12          these older folks.  When you go on match.com, are you

13          creating some sort of profile or kind of personal page

14          to participate in the online dating?

15     A    Yes.

16     Q    Okay.  So is that, like, step one?

17     A    Yes.

18     Q    Okay.  And what sort of things do you or others do on

19          match.com to create these profile pages?  What sort of

20          information is typically available?

21     A    You put pictures of yourself, talk about your hobbies,

22          your interests, and there are questions about, like,

23          your religion, your education, the travel that you've

24          done, your occupation, and that sort of thing.

25     Q    Okay.  And so you did that?
```

1    A    Yes.

2    Q    And you posted your own profile pages on match.com,

3         correct?

4    A    Yes.

5    Q    And this was a few years ago.  That would be 2015; does

6         that sound about right?

7    A    Yes.

8    Q    Okay.  And then you said that you met Mr. Fredin on

9         match.com.  So I'm assuming that Mr. Fredin had his own

10        match.com profile page at some point in 2015?

11   A    Yes.

12   Q    And so do you recall if you reached out to Mr. Fredin

13        first or Mr. Fredin reached out to you?

14   A    He reached out to me first.

15   Q    Okay.  And he initiated contact by means of an e-mail?

16   A    Yes.

17   Q    And that's typical for match.com beginnings?

18   A    Yes.

19   Q    Okay.  And so he sends you the e-mail and you look at

20        his profile page; is that right?

21   A    Yes.

22   Q    And you decide whether or not you want to accept some

23        sort of invitation, correct?

24   A    Yes.

25   Q    And had you met other people before Mr. Fredin on

—214—

62-CR-17-3156

CASE 0:19-cv-03051-SRN-HB   Document 88   Filed 04/06/20   Page 20 of 137   Filed in District Court
State of Minnesota
4/8/2019 4:26 PM



1          match.com?

2     A    Yes.

3     Q    Approximately how many?

4     A    Several.  I don't know how many.  It was usually just a

5          first date.

6     Q    Okay.  So are we talking about three or four first

7          dates or are we talking about a dozen first dates?

8     A    Yeah, maybe four in Minnesota.

9     Q    Okay.  And when you say, just first dates, it sounds

10         like you have the one and you decide, it's not for me,

11         this person's not a good fit, and you kind of move on?

12    A    Uh-huh.  I had a couple brief relationships, but

13         nothing serious from the site.

14    Q    Okay.  And then Mr. Fredin gets in touch with you and

15         -- do you recall about what time -- or, you know, what

16         part of the year of 2015 Mr. Fredin reached out to you?

17    A    It was either the end of August or the beginning of

18         September.

19    Q    Okay.  And you had looked at his profile page, and you

20         decided, I'm going to at least try a first date with

21         this guy?

22    A    Yes.

23    Q    Do you remember anything about your sort of initial

24         impressions about that first date?

25    A    Not much.  He was good at having a conversation and was

-215-

```
 1          quiet.
 2    Q     Where did you meet?
 3    A     At the Bonfire on Grand Avenue.
 4    Q     Okay.  So that's Victoria and Grand, over here in St.
 5          Paul?
 6    A     Yes.  It's closed now.
 7    Q     Okay.  The Bonfire restaurant?
 8    A     Yes.
 9    Q     And that's where you met for your first date, and
10          things went okay, things went fine?
11    A     Yes.
12    Q     And did things go well enough that you wanted to see
13          Mr. Fredin again?
14    A     Yes.
15    Q     Okay.  So how did it go from there, if you will, after
16          that first date?  Did you accept a second invitation or
17          did you offer an invite, if you recall?
18    A     I don't remember.  We just talked back and forth for a
19          while and would occasionally meet.
20    Q     Okay.  And are you exchanging personal contact
21          information outside the platform of match.com?
22    A     Yes.
23    Q     So you're sharing cell phone numbers and, perhaps,
24          where you live, that sort of thing?
25    A     Yes.
```

—216—

1    Q    And it's fair to say, with this online dating, people
2         basically reveal kind of step by step more and more
3         about themselves, as they become more and more
4         comfortable in a relationship; is that right?
5    A    Yes.
6    Q    A lot of times, people are guarded at the beginning?
7    A    Yes.
8    Q    So things started off okay with Mr. Fredin, and you
9         decided you wanted to try a second date.  Did it go
10        beyond a second date?
11   A    Yes.
12   Q    Third date?
13   A    Yes.
14   Q    So what were the dates involving?  Were they always
15        meals at restaurants or did they involve other
16        activities?
17   A    I think it was mostly meals at restaurants, we went to
18        a play once, and I think that's about it.
19   Q    Okay.  So why don't you tell the jury a little bit
20        about sort of the first months of that relationship and
21        what you saw in Mr. Fredin that you liked and what you
22        thought you might want to nurture in that relationship,
23        at least at the beginning?
24   A    We would see each other a couple times a week.
25        Usually, it centered around a restaurant and that sort

1    of thing.  Sometimes he would come over and I would

2    make dinner or something like that.  I guess I

3    continued to pursue the relationship because he -- he

4    was educated.  He seemed smart and was good at having a

5    conversation and seemed very nice.

6  Q  So this is August, September, October; is that about

7    right?

8  A  Yes.

9  Q  Okay.  Now, at some point in this early stages, the

10   early months of this dating relationship, did you start

11   having some concerns or reservations about this dating

12   relationship with Mr. Fredin?

13 A  Yes.

14 Q  What sort of concerns did you have and why?

15 A  He started acting a little possessive, I suppose, a

16   little too intense for that stage in our relationship.

17 Q  Intense in what way?

18 A  Like, one day we had a -- we had a conversation on

19   Facebook, and he was supposed to take me out for dinner

20   that night.  And he said, not until you say you're

21   mine, and I said, well, I'm yours-ish, we're dating,

22   but no, not yours, and he kept pressing and pressing

23   and wouldn't come over and said, I'm not coming over

24   until you say you're mine.  And so I said, all right,

25   well, then I'm getting pizza and a movie and we're not

—218—

Filed in District Court
State of Minnesota
4/8/2019 4:26 PM



```
 1              going out tonight.  But he would also talk a lot about,

 2              like, getting married and having kids and that sort of

 3              thing.

 4      Q       So some of the concerns was this creepy possessiveness,

 5              you're mine?

 6      A       Yes.

 7      Q       You didn't care for that?

 8      A       No.

 9      Q       And then you talked about the intensity.  It was him

10              pushing issues of marriage or children and things which

11              you felt were maybe a little too early to talk about,

12              and that caused you concern?

13      A       Yes.

14      Q       But he didn't threaten you in any way, did he?

15      A       No.

16      Q       Okay.  So I know this is an uncomfortable question,

17              perhaps, but were the two of you ever romantically

18              intimate during the dating process?

19      A       Nothing more than just kissing once.

20      Q       Okay.  All right.  No stay-over-the-night, that sort of

21              thing?

22      A       No.

23      Q       So you've told us a little bit about the initial

24              concerns.  And so did things improve when you basically

25              told him, you know, we're not getting together under
```

—219—

```
 1            these terms?  Did anything change in the relationship
 2            or did Mr. Fredin kind of keep going in the same
 3            direction?
 4       A    He did keep going in the same direction, yes.
 5       Q    So what can you tell the jury, in general, about how
 6            things were intensifying that were increasingly making
 7            you feel uncomfortable?
 8       A    Well, something specific that I remember was, the last
 9            time we ever actually went on a date, he started asking
10            me questions that made me really uncomfortable.
11       Q    Questions about what?
12       A    He asked me -- for example, he said, are you a lesbian?
13            And I said, well, no, I'm not, and he said, I bet you
14            are.  And he asked me, like, what my sexual history was
15            with other men and wouldn't -- wouldn't leave it alone,
16            even when I said, I don't want to talk about that.
17       Q    Okay.  That was the last time you had a date in a
18            restaurant?
19       A    Yes.
20       Q    Do you know about what time that was, in terms of the
21            month or so?
22       A    It was -- it was before Thanksgiving, but I can't
23            recall the day.
24       Q    Okay.  Thanksgiving of 2015?
25       A    Yes.
```

1    Q    So if that's the last time that you met together out on

2         a date at a restaurant, what did you tell Mr. Fredin,

3         if anything, about what you wanted or what you didn't

4         want in terms of a continued relationship with him?

5    A    Well, I told him, I didn't want to be exclusively

6         dating him, because he was coming across as a little

7         intense, and I said, we can still see each other, we

8         can still go on dates, but this is too much for me.

9    Q    And would he try to ask you out on other dates after

10        that?

11   A    Yes.

12   Q    Did you ever accept him on an invitation for another

13        date?

14   A    Not after that one that -- the night that we went to --

15        I think it was an Irish pub.

16   Q    That was the last date in which he was asking you

17        questions about sex?

18   A    Yes.

19   Q    And your orientation?

20   A    Uh-huh.

21   Q    That's a "yes"?

22   A    Yes.

23   Q    Okay.  Now, so where did things go from here as far as

24        going forward with Mr. Fredin?  Did you see any sort of

25        relationship in any form going forward after that

Filed in District Court
State of Minnesota
4/8/2019 4:26 PM

1    uncomfortable date before Thanksgiving?

2  A  It made me really cautious, but I did tell him, I would

3     continue to see him.

4  Q  Okay.  And so you told him that you would continue to

5     see him, but did you put down any terms or conditions,

6     or was it just kind of, we'll see where this goes?

7  A  It was more like -- at that time, it was, we could see

8     where this goes.

9  Q  And this is in mid-November?

10 A  Yes.

11 Q  Okay.  Did anything significant happen in your life

12    around that time, at the end of November, as you were

13    going forward with Mr. Fredin or others?

14 A  Like, a life event or --

15 Q  Yes, anything going on at work or school that was

16    important to you?

17 A  That semester was my last semester of classes, and I

18    was getting ready to take my preliminary exams.  And

19    just before I terminated the relationship entirely, I

20    took a trip to Germany with my class.

21 Q  Okay.  Which class?

22 A  It was an environmental humanities class, an English

23    class.

24 Q  Through the University of Minnesota?

25 A  Yes.

1   Q   Took a brief trip to Germany?

2   A   Yes.

3   Q   For how long?

4   A   About a week.

5   Q   Okay.  And then this was prelude to your preliminary

6       examinations in graduate school?

7   A   Yes.

8   Q   Is that an important set of examinations for a grad

9       student?

10  A   Yes.

11  Q   In what way is it significant?

12  A   It's kind of the portal, I guess, between taking

13      courses and getting to take your -- getting to write

14      your dissertation.  So once you pass your preliminary

15      exams, you're allowed to start work on your

16      dissertation, which is the final step in the program.

17  Q   Okay.  So when you came back from Germany and you were

18      rolling into your preparations for preliminary exams,

19      what was your relationship like with Mr. Fredin at that

20      point?

21  A   I hadn't -- I hadn't seen him in a while, and there was

22      a couple of weeks I was really busy, because I even had

23      drill weekends at work, and I had been sick and I was

24      studying.  So I didn't see much of him, but he

25      contacted me quite a bit and asked me to see him.

1    Q    Okay.  And was this contact by social media or e-mail

2         or through other means?

3    A    It was on Facebook mostly.

4    Q    Okay.  Did you guys ever use telephones?

5    A    Sometimes.

6    Q    All right.  But it was mainly Facebook messaging at

7         this point?

8    A    It was mainly Facebook messaging, which is like a text

9         message app.

10   Q    And you're going back and forth day after day after

11        day, sending messages back and forth to each other?

12   A    Yes.

13   Q    Almost every day?

14   A    Yup -- yes.

15   Q    And how many messages, on average, in a day would you

16        be sending back and forth to Mr. Fredin after you came

17        back from your trip?

18   A    It depends on the day.  Sometimes it was just

19        exchanging small talk about our jobs and that sort of

20        thing, and sometimes it would be him asking to see me.

21   Q    Did you ever accept any of his requests to see him in

22        person or have a date with him, then?

23   A    No.

24   Q    Why?

25   A    Well, at first, it was because I was sick and working

—224—

Filed in District Court
State of Minnesota
4/8/2019 4:26 PM



1      and didn't have time, but as he started to get more

2      demanding, it became about the fact that his -- his

3      behavior was starting to make me uncomfortable.

4   Q   Okay.  In what ways would his behavior make you

5      uncomfortable at that point after Thanksgiving?

6   A   He -- it started with him telling me, you know, be a

7      good girl for me, and at one point I told him, stop

8      saying that, it's patronizing, it's insulting, and he

9      would -- he'd keep doing it.  And he kept asking me why

10     I didn't want a relationship with him, and when I tried

11     to explain, he just didn't seem to accept it.

12  Q   Now, frankly, that sounds more like -- rather than

13     behavior, this sounds like attitudes expressed and

14     verbal communications?

15  A   Yes.

16  Q   Okay.  So we're not talking really about conduct at

17     this point so much, right?

18  A   Right.

19  Q   We're talking more about his behavior in terms of the

20     attitudes that he was setting forth to you in these

21     electronic communications?

22  A   Yes.

23  Q   These were the control messages and the things that

24     were making you increasingly uncomfortable?

25  A   Yes.



1   Q   So in your mind, were you trying to consider some sort

2       of complete break at this point after Thanksgiving or

3       were you trying to manage the relationship somewhere

4       short of a complete, clean break?

5   A   At one point, I told him that he had three choices:  We

6       could be friends, on good and mature terms; he could

7       leave and terminate things entirely; or, you know, he

8       could continue sending me these uncomfortable messages

9       and I would just block everything and wouldn't talk

10      anymore.

11  Q   You literally gave him that sort of three options.  By

12      what means did you make yourself known with those

13      options?

14  A   This was still Facebook Messenger.

15  Q   So the three options were:  be my friend but accept

16      that we're not together?

17  A   Yes.

18  Q   Number two, never see me again and accept that we're

19      not together?

20  A   Yes.

21  Q   Number three, continue to send me pictures of the

22      leather I should be wearing and talk about how jealous

23      I'll be when I see you and I'll block you and not talk

24      to you again?

25  A   Yes.

-226-

Filed in District Court
State of Minnesota
4/8/2019 4:26 PM

```
 1    Q   Do any of those options contemplate a continued dating

 2        relationship, other than mere friendship?

 3    A   No.

 4    Q   What did you really want at that point?

 5    A   At that point, either be friends or have him out of my

 6        life.  I did not want a dating relationship anymore.

 7    Q   Why would you even want to be friends with this man,

 8        Mr. Fredin, if he was making you uncomfortable with

 9        that sort of possessive dominating demands that was

10        increasing?  Why would you even consider a friendship?

11    A   I had no idea at this point.  At first -- you know,

12        I've -- I've never dealt with anything like this

13        before, something, I guess, clear-cut, this is, you

14        know, a harassment or a stalking situation.  It's -- I

15        guess it's easy to second-guess your instincts when

16        you're looking at it for the first time.

17    Q   Okay.  Now, you had been online dating before, for

18        years, on and off?

19    A   Yes.

20    Q   And you had been in several relationships before Mr.

21        Fredin?

22    A   Yes.

23    Q   Did you have anything remotely like these sorts of

24        problems with anyone else, other than Mr. Fredin?

25    A   Never.
```

—227—

62-CR-17-3156

CASE 0:19-cv-03051-SRN-HB   Document 88   Filed 04/06/20   Page 33 of 137   Filed in District Court
State of Minnesota
4/8/2019 4:26 PM

1   Q   You were in new territory?

2   A   Yes.

3   Q   Trying to figure out what to do?

4   A   Yes.

5   Q   So did Mr. Fredin express a preference amongst the

6       three options that you offered him?

7   A   No.  I think he just argued and said, we should still

8       see each other.

9   Q   All right.  So let's start beating down and focusing on

10      the events in early December, specifically starting

11      around December 3 or so.  Do you remember a series of

12      Facebook messages and exchanges between you and Mr.

13      Fredin in that first week of December?

14  A   Yes.

15  Q   Okay.  And what was unusual or different about what was

16      going on in early December than what was going on

17      before then?

18  A   He was -- I'm trying to remember.  He was very

19      domineering.  For example, he -- he told me I could not

20      date other men and not go on any more first dates.  He

21      told me that we were dating and that I was going to

22      take him to see my family.

23  Q   Okay.

24              MR. CHRISTIE:  Now, may I approach the

25      witness, Your Honor?

```
1              THE COURT:  You may.

2     Q    (By Mr. Christie, continuing) Ms. Miller, I'm showing

3          you what's been marked for identification as Exhibit 1.

4          It's a collection of five different pages.  Can you

5          briefly tell us what we're looking at here in Exhibit

6          1?

7     A    This is a sequence of Facebook messages that I took

8          screen shots of and eventually gave to the police.

9     Q    And these are messages between you and who?

10    A    These are messages between me and Mr. Fredin.

11    Q    Okay.  And for those of us who might not know Facebook

12         messaging, do the messages also -- are they accompanied

13         by photographs?

14    A    Yes.

15    Q    Okay.  And so on this document, do we have photographs

16         of Mr. Fredin and you, Ms. Grace Miller?

17    A    Yes.

18              MR. CHRISTIE:  I would offer into evidence

19         Exhibit 1, Your Honor.

20              MS. ZAUHAR:  No objections.

21              THE COURT:  It shall be received.

22    Q    (By Mr. Christie, continuing) So let's talk a little

23         bit about how this exhibit was put together.  This is

24         something that you prepared for the police

25         investigation that ultimately developed in this
```

—229—



```
 1              situation, correct?

 2    A    Yes.

 3    Q    And is it fair to say that you basically took certain

 4         collections or threads of messages and sort of pieced

 5         them together in a larger document?

 6    A    Yes.

 7    Q    And here we have five pages of a collection of messages

 8         going back and forth between you and Mr. Fredin,

 9         beginning December 3, correct?

10    A    Yes.

11    Q    But there are a lot more messages than this; is that

12         right?

13    A    Yes.

14    Q    Pages and pages and pages of messages?

15    A    Right.

16    Q    About all sorts of things?

17    A    Yes.

18    Q    But what was it about these particular messages that

19         you decided was important to collect for the police to

20         consider eventually when the police got involved months

21         later?

22    A    Just that the language was very aggressive.  He said a

23         couple times that he was coming over, even when I told

24         him I didn't want him to, and what I had described

25         before when he was telling me I could not see other
```

—230—

1      men, that instead we were dating.

2    Q  Okay.

3          MR. CHRISTIE:  Your Honor, at this time, with

4      your permission, I'd like to publish or display Exhibit

5      1 to the jury by means of a projector, and if allowed,

6      maybe your clerk could dim the lights for us.

7          THE COURT:  You shall be permitted to play

8      Exhibit 1 on the projector.  And, Ms. Valento, if you

9      could assist with the lighting.

10         And for the jury's benefit, you will receive

11      Exhibit 1 into evidence and have it with you when you

12      deliberate at the end of the trial, as with all other

13      exhibits that will be received at a later time.

14          MR. CHRISTIE:  Can everybody see that?

15          (Whereupon, the members of the jury responded

16      affirmatively.)

17    Q  (By Mr. Christie, continuing) So, Ms. Miller, what

18      we're looking at is basically a digitized projection of

19      the documents that we just talked about as Exhibit 1,

20      correct?

21    A  Yes.

22    Q  So these are the Facebook messages going back and forth

23      between you and Mr. Fredin.  And we've got this first

24      set of messages going back and forth.  Basically, it

25      seems like you're trying to say, good night, but Mr.

1       Fredin says, I'm coming over; is that right?

2   A   Yes.

3   Q   So why did you include this for the police?

4   A   To show that I had already said no to him.

5   Q   Did he, in fact, come over that night?

6   A   I don't know.

7   Q   When he said in this Facebook message, I'm coming over,

8       do you recall what your reaction was at the time, on

9       December 3?

10   A   Just double-checked that the locks were all locked, and

11       I turned off all of the lights in my house and locked

12       myself in a room and went to sleep.

13   Q   Why all of that, for that message?

14   A   Because I wanted him to think that I was sleeping.

15   Q   And we have a second bracket here.  Can you tell the

16       jury why you included this set of exchanges between you

17       and Mr. Fredin on or around December 3?

18   A   Well, he tells me again, I'm coming over.

19   Q   Is this the same night, if you recall, or is it a

20       different night?

21   A   It was a different night.

22   Q   In one of the messages Mr. Fredin writes, sometimes I

23       feel like you're an emotionally -- that you are

24       emotionally 16 years old, and your reply is, you don't

25       have to insult me?

232



```
 1    A    Yes.
 2    Q    Had he ever said anything like that before to you, that
 3         you were an emotional child?
 4    A    I don't recall him saying that specifically.
 5    Q    Now, we have another collection that you put together.
 6         What was concerning about this thread?
 7    A    Just, again, the possessive language that I'm not
 8         allowed to date others.
 9    Q    And that includes first dates, according to Mr. Fredin?
10    A    Yes.
11    Q    And you say, whatever, and he says, be a good girl for
12         me, I like you too much, we get along too well, be
13         vulnerable, don't be afraid.  How did that make you
14         feel?
15    A    It was -- it was a little scary, because he's telling
16         me that we're dating and also that I needed to change
17         my behavior and change my mind set.
18    Q    Now, we have another collection here where you start
19         out, how about we be friends and I will take you out
20         for your birthday?  What was the context of that
21         exchange?
22    A    Well, he -- throughout this conversation, he was
23         begging me to take me out -- to take him out for his
24         birthday.
25    Q    His birthday is December 12?
```

233

1   A   Yes.

2   Q   So this is about a week to ten days before that?

3   A   Yes.

4   Q   And you put down some terms:  we'll be friends and then

5       I'll take you out for your birthday.  And he insists

6       what?

7   A   Nope, we are dating and that I was going to take him to

8       see my family.

9   Q   So, clearly, in the context of your relationship,

10      dating is different than friendship?

11  A   Yes.

12  Q   Fair to say?

13  A   Yes.

14  Q   Friends is one thing and dating is taking it to a

15      different level?

16  A   Yes.

17  Q   At this time, did you feel like you were dating Mr.

18      Fredin?

19  A   No.

20  Q   Possibly friends?

21  A   Yes.

22  Q   And then you include some sort of photograph saying,

23      this is not how it works.  What was that about?  Why

24      did you put that in?

25  A   It was a funny blurb from a commercial on TV, where a

1    woman is putting pictures on her wall, and she's

2    calling it "posting it to my wall."  She just

3    misunderstands what Facebook is, I guess.  And so I

4    meant that to communicate that that's not how this

5    works, you can't just tell somebody that you're dating.

6 Q  Was this a joke to you?

7 A  At that point, I was trying to add some levity, I

8    guess, to a really uncomfortable situation.

9 Q  Okay.  Next collection starts, no, I'm done talking to

10   you tonight, you've pissed me off, enjoy the rest of

11   your night.  And he says, be a good girl for me, and

12   then he sends to you a photograph of himself?

13 A  Yes.

14 Q  And you include this, again, for what reason?

15 A  Because he's telling me how to behave.

16 Q  So things go on and on, and the jury will be able to

17   see this exhibit for themselves during deliberations,

18   but let's talk about the next page.  Can you describe

19   for the jury what we're looking at here, for purposes

20   of this court record?

21 A  A picture of a woman wearing some sort of, I guess,

22   dominatrix outfit or costume.

23 Q  Had Mr. Fredin ever showed you anything like this

24   before?

25 A  No.

CASE 0:19-cv-03051-SRN-HB   Document 88   Filed 04/06/20   Page 41 of 137

Filed in District Court
State of Minnesota
4/8/2019 4:26 PM

```
 1    Q    This was the first time you've seen anything remotely
 2         like this from Mr. Fredin?
 3    A    Yes.
 4    Q    This was on or about December 3, 4, 5?
 5    A    Yes.
 6    Q    Did you feel at any time during your relationship,
 7         dating and friendship, that you ever invited any sort
 8         of sexual advances?
 9    A    No.
10    Q    How does this photograph make you feel?
11    A    It was really creepy, he never sent anything like that
12         before, and I thought it was insulting.
13    Q    And then he writes, you should have nightly tasks, and
14         what is your reply?
15    A    Stop it.
16    Q    And then he says, you should meditate nightly, get on
17         your knees, and think of me.  It's good for your mental
18         health.  Also, you're not going on any more first
19         dates.  Did you ever reply to any of that?
20    A    I might have.  I don't have it on here.
21    Q    Okay.  And then the next collection he writes, why are
22         you opposed to these things?  And what is your reply?
23    A    Because I don't want a relationship with you anymore.
24         I told you.
25    Q    What did you mean by "relationship"?
```

-236-

1    A    Dating relationship, romantic relationship.

2    Q    And he replies, you do and will, you need it?

3    A    Yes.

4    Q    So in the next collection of exchanges on Facebook, Mr.

5         Fredin says, you're a very boring person, you have zero

6         interest or excitement, I would never be your friend.

7              What did this do for you?

8    A    I don't he's -- He would occasionally take something

9         like this and, like, intersperse insults with asking me

10        for a relationship.  It kind of creeped me out that he

11        was trying to insult me at the same time that he was

12        asking me for a relationship.

13   Q    And what about birthday?  What's going on with the

14        birthday plans at this point?

15   A    They're going downhill at this point, but I told him

16        I'd still take him out if we could go as friends.

17   Q    Even though you didn't want a dating relationship, you

18        were still willing to take him out as friends for his

19        birthday?

20   A    Yes.

21   Q    Did you really want to do that?

22   A    No.

23   Q    Why did you say you'd be willing to do it?

24   A    Because he was so insistent on it, and eventually he

25        said, nobody's ever taken me out for my birthday.  And

-237-

1          I felt guilty for hurting him.

2    Q   And some people might say, you may be sending mixed

3          messages with this type of exchange.  How would you

4          answer those people?

5    A    I would say, my message is clear.  I told him several

6          times, there's no situation where I'm going to be in a

7          relationship with you.

8    Q    Now, we have this next post.  It says, as friends,

9          because you've pissed me off, and no means f'ing no.

10   A    Sorry about that.

11   Q    Do you sometimes use the f-word?

12   A    Occasionally.

13   Q    Okay.  And even though you're angry at him, you're

14         still willing to consider his birthday?

15   A    Yes.

16   Q    Was it possible for you to forgive him for these

17         insults, these demands?

18   A    Yes.

19   Q    What does forgiveness mean for you?

20   A    Just saying, you know, I understand that this is hard

21         for you and there are a lot of emotions, and if you're

22         sorry, of course, I'll forgive you, but I'm still not

23         going out with you.

24   Q    So let's talk about this paragraph at the bottom of

25         page four.  You say, no, I agreed to do that, and it

1        didn't work.  What are you referring to when you say

2        "that"?

3    A   So going on occasional, casual dates.

4    Q   So that didn't work, and that's not in the cards

5        anymore?

6    A   No.

7    Q   And then you say, because you forbade me from seeing

8        other guys, I smashed your face with my mouth when I

9        tried to pull away from kissing you.  Can you tell us

10       what you had in mind when you wrote that?

11   A   That was the last time I saw him.  At the end of the

12       date at the Irish Pub where he, you know, accused me of

13       being a lesbian and asked me about my sexual history

14       with other men, we were in a car and he tried to kiss

15       me and I pulled away and he grabbed the back of my head

16       and made me kiss him.

17   Q   Did it hurt?

18   A   No.

19   Q   How did you feel after that?

20   A   I just wanted to get away and be done.

21   Q   That was your good-night kiss?

22   A   Yes.

23   Q   His good-night kiss?

24   A   Yes.

25   Q   And then you tell him pointblank, now you're going

1      completely f'ing psychotic when I break things off.

2      Why on Earth would I want more of this.

3           Breaking what off?

4  A   Our romantic relationship.

5  Q   And his reply had something about a thought experiment

6      weekend.  What did you make of that?  What was your

7      understanding of a thought experiment weekend?

8  A   He had said some ugly things to me before.  He -- he

9      said that he wanted to see if I was into, quote, alpha

10     guys, and so he said that the reason he was ugly and

11     domineering was because he wanted to see how I would

12     react.

13 Q   Did you take him out for his birthday on the 12th?

14 A   No.

15 Q   And you start using a little bit more profanity, f you

16     and your thought experiments.  You've done this shit

17     before.  We're not going on even an occasional date.

18     Is that right?

19 A   Yes.

20 Q   And is Brock still concerned about whether you're

21     taking him out for his birthday?

22 A   Yes.

23 Q   You replied, no means no, or seriously, I will never

24     speak with you again, I'm sick of this, no.

25 A   Yes.

—240—

1   Q   What -- what did you mean by, no means no?  Saying no
2       to what?
3   A   That no is an answer that should be respected at all
4       times.
5   Q   No to what?
6   A   No to a romantic relationship.
7   Q   Still a possibility of a friendship?  Still a
8       possibility of seeing each other?
9   A   Well, there I say, no means no, or seriously I will
10      never speak to you again.  So I guess I was saying,
11      yeah, I'll still speak to you if you accept no.
12  Q   This is the end of the five pages of Exhibit 1, and
13      these are messages from December 3, 4, and 5, correct?
14  A   Yes.
15  Q   So as things were going on between you and Mr. Fredin
16      over Facebook messenger, did you do anything with
17      regards to your Facebook account concerning Mr. Fredin?
18  A   Yes, I blocked him on Facebook Messenger.
19  Q   When?
20  A   I don't recall the exact date.
21  Q   Was it around this time?
22  A   Yes.
23  Q   And what does it mean to block somebody on Facebook
24      Messenger?
25  A   It just means that they can't send you messages and you

1          can't send them messages.

2     Q    So did the communication between you and Mr. Fredin end

3          then, once you blocked him on Facebook Messenger?

4     A    No.

5     Q    How did it continue?

6     A    He started texting me.

7     Q    By what means?

8     A    By a known phone number.  So actual telephones.

9     Q    How about cell phones?

10    A    Yes, cell phones.

11              MR. CHRISTIE:  May I approach, Your Honor?

12              THE COURT:  You may.

13    Q    (By Mr. Christie, continuing) I'm showing you what's

14         been marked as Exhibit 2 for identification.  Can you

15         tell us what this shows?

16    A    On this page, there are text messages from three

17         different phone numbers.

18    Q    Okay.  And did you create this document?

19    A    Yes.

20    Q    And are these messages between Mr. Fredin and you?

21    A    Yes.

22              MR. CHRISTIE:  I would offer into evidence

23         Exhibit 2.

24              MS. ZAUHAR:  No objections.

25              THE COURT:  Exhibit 2 shall be received.



1    Q    (By Mr. Christie, continuing) Okay.  So how do we know
2         that these are messages from Mr. Fredin?
3    A    Because he had used the first phone number to contact
4         me multiple times and he had used the second number for
5         very occasionally.
6    Q    And did you say there was a third, as well?
7    A    Yes.
8    Q    Did you know that third phone number?
9    A    No.
10   Q    How did you know it was from Mr. Fredin?
11   A    Because it was basically the same sequence of
12        conversation, begging me to forgive him and that sort
13        of thing.
14   Q    So we're looking at Exhibit 2 up on the screen,
15        correct?
16   A    Yes.
17   Q    And there are some dates on these four screenshots that
18        are contained on this second page, correct?
19   A    Yes.
20   Q    All right.  Now, let's talk about how this document was
21        created.  Did you take the screenshots yourself?
22   A    Yes.
23   Q    Okay.  Can you tell the jury how you do that?
24   A    On my phone, you just press two items simultaneously,
25        and it automatically just takes a photo of whatever is

-243-



```
 1              on the screen.
 2      Q     So we're looking in the upper left-hand corner.  And
 3              there's a phone number that ends 5512, and we see a
 4              date of December 9, 2015, in the evening, correct?
 5      A     Yes.
 6      Q     And it starts, I'm kind of depressed from you not
 7              taking me out on Saturday for my birthday.  Is that Mr.
 8              Fredin or is that you?
 9      A     That is Mr. Fredin.
10      Q     Okay.  He's still talking about the same birthday stuff
11              days after what we just saw moments ago on Facebook; is
12              that right?
13      A     Yes.
14      Q     Okay.  And so the messages that are justified to the
15              left are Mr. Fredin, correct?
16      A     Yes.
17      Q     And then there's some messages that are justified to
18              the right, and those are you?
19      A     Yes.
20      Q     Now, in the upper right-hand corner, it appears that
21              Mr. Fredin is professing his love, talks about how he's
22              hurt, just don't block me, I'll stop communicating and
23              you can notify me in the future if you ever want to
24              talk, I don't want to lose you, it feels like his
25              heart's going to die.
```

1        What's your reply?

2   A    I gave him a chance to be an adult about it and --

3   Q    That's not the words you used, is it?

4   A    No, I used the word "grown-ass man."

5   Q    Okay.  And a chance to be friends, and you say, what?

6   A    You blew it.

7   Q    So now we're talking about not even friends, correct?

8   A    Right.

9   Q    So you had considered friendship instead of dating, and

10       now at this point, in the first part of December, it's

11       not even friends?

12  A    Right.

13  Q    Did you block contact -- or block the number for Mr.

14       Fredin with this number ending 5512?

15  A    Yes.

16  Q    Okay.  And then what happened?  Did the messages

17       continue or did they stop?

18  A    They continued on a different phone number.

19  Q    Okay.  Let's look at this message on the lower right,

20       February -- excuse me, December 10, 2015, at 9:08 a.m.,

21       in the morning.  It starts, no.  What does it say?

22       Could you please read it for us?

23  A    Where.

24  Q    On the right:  No, this has to stop?

25  A    No, this has to stop.  I've told you multiple times to

```
 1            leave me alone, and you won't.  It's creepy and

 2            unattractive.  This is stalking.  Stop it.

 3    Q    This is stalking.  At that point, did you have any idea

 4            what the Minnesota laws were regarding stalking?

 5    A    No, but I had a general sense of what it meant.

 6    Q    All right.  And then his reply is, your loss, you'll

 7            never find someone as talented as me?

 8    A    Yes.

 9    Q    So did you block all three of those numbers?

10    A    Yes.

11    Q    It was about February -- excuse me, December 10, 2015;

12            is that right?

13    A    Yes.

14    Q    Did things stop, then, on December 10?

15    A    No.

16    Q    Did they start up on December 11 or any time before

17            Christmas or after Christmas?

18    A    After Christmas.

19    Q    Okay.  So there was a bit of a lull?

20    A    Yes.

21    Q    Okay.  And when did things start up again?

22    A    About the beginning of January.

23                  MR. CHRISTIE:  Your Honor, may I approach?

24                  THE COURT:  You may.

25    Q    (By Mr. Christie, continuing) I'm showing you what's
```

—246—

```
 1              been marked as Exhibit 3, and can you tell us what

 2              those are?

 3     A        It's an e-mail from Mr. Fredin to me.

 4     Q        Okay.  And it's using his own gmail address?

 5     A        Yes.

 6     Q        Okay.  And you put these two e-mails together in a

 7              single document for the police?

 8     A        Yes.

 9                       MR. CHRISTIE:  The State would offer Exhibit

10              3.

11                       MS. ZAUHAR:  No objections.

12                       THE COURT:  Exhibit 3 shall be received into

13              evidence.

14     Q        (By Mr. Christie, continuing) Is this what we're

15              looking at, Exhibit 3?

16     A        Yes.

17     Q        So on December -- excuse me, January 3, Mr. Fredin

18              says, I miss you, I'm sorry, I have so much to tell

19              you, and then there's some sort of video embedded under

20              print and flowers.  Do you know what that is?

21     A        It was a music video.

22     Q        Did it have any special significance to you or Mr.

23              Fredin?

24     A        I think it was, you know, some sort of romantic song.

25              I didn't really listen to it.
```

—247—

1    Q    Okay.  And you replied to him the next day, no, I told

2         you to leave me alone.  I don't care how you feel.

3         This is stalking and harassment.  I was serious when I

4         said I would call the cops.  If you contact me again, I

5         will.

6              Is that right?

7    A    Yes.

8    Q    So at this point, in early January, you were willing to

9         call the cops if he contacts you again?

10   A    Yes.

11   Q    Had you thought about that decision?

12   A    Yes.

13   Q    Thought about what it might mean to bring the police

14        into your personal affairs?

15   A    Yes.

16   Q    Bring the authorities into your home, into your phone,

17        into your computer, and perhaps bring you into court,

18        did you consider all of that?

19   A    I didn't consider the extent to which this might go.  I

20        did not foresee this, but I -- I did consider, yes,

21        that I'd have to call the police.

22   Q    Why get the police involved?

23   A    Because I had blocked four different means of

24        communication already, and he didn't care.  It's like

25        breaking down someone's door.

1    Q    All right.  Did you call the police on January 4?

2    A    No.

3    Q    Did you get any communication from Mr. Fredin in the

4         following week?

5    A    No.

6    Q    At any time in January?

7    A    Yes.

8              MR. CHRISTIE:  Your Honor, may I approach?

9              THE COURT:  You may.

10   Q    (By Mr. Christie, continuing) I'm showing you what's

11        been marked as Exhibit 4.  Can you tell us what we're

12        looking at?

13   A    This is an e-mail notification that I got a payment

14        from him on PayPal and two e-mails from him.

15   Q    Okay.  Did you put together this document?

16   A    Yes.

17   Q    And on page two, what do we see?

18   A    This is a confirmation that I refunded the money that

19        he sent me.

20             MR. CHRISTIE:  The State would offer into

21        evidence Exhibit 4, Your Honor.

22             MS. ZAUHAR:  No objection.

23             THE COURT:  It shall be received.

24   Q    (By Mr. Christie, continuing) PayPal, that's an online

25        payment service; is that right?

1    A    Yes.

2    Q    Did you use PayPal at all before this?

3    A    Yes, but not with Mr. Fredin.

4    Q    This was the first time you had any sort of interaction

5         financially with Mr. Fredin over PayPal?

6    A    Yes.

7    Q    January 24?

8    A    Yes.

9    Q    Did you expect $50 from Mr. Fredin?

10   A    No.

11   Q    Did he owe you $50?

12   A    No.

13   Q    Did you ever ask him for $50?

14   A    No.

15   Q    Do you have any sense whatsoever why Mr. Fredin sent

16        you $50 through PayPal on January 24?

17   A    Partly because he had alluded to wanting to give me

18        money.  I never took money from him, but also I thought

19        this was -- I blocked his e-mail address, and I thought

20        this was a way for him to get around the fact that I

21        had blocked his e-mail address, because I can't really

22        block PayPal.

23   Q    I see.  $50?

24   A    Yes.

25   Q    Did you consider keeping the money?

Filed in District Court
State of Minnesota
4/8/2019 4:26 PM

```
 1    A    No.

 2    Q    Why not?

 3    A    Because I don't want anything from him.

 4    Q    He sent you a note with the $50, didn't he?

 5    A    Yes.

 6    Q    What did it say?

 7    A    Thank you for everything.

 8    Q    That same day, did Mr. Fredin send you an e-mail?

 9    A    Yes, he sent me two.

10    Q    Okay.  This e-mail has a photograph next to it.  Why is

11         that?

12    A    It's from gmail, and gmail usually allows you to have a

13         photograph associated with your account.

14    Q    Hopefully, you don't block me for this $50.  And what's

15         this next line, after he says, hopefully, you don't

16         block me?

17    A    Please do, however, block me instead of anything

18         else/calling the cops.

19    Q    He'd have you believe that he was worried about you

20         calling the police?

21    A    Yes.

22    Q    There's a second e-mail from the same date of January

23         24 from Mr. Fredin to you.  It's flattering.  It says,

24         you're gorgeous, amazing, exciting, and beautiful.

25         You're the most beautiful woman I know.  I forgot to
```

```
1              add that, sorry.
2                  What did you make of that?
3      A   It's just desperate, I suppose, but he's still trying.
4      Q   You're flattered anyway?
5      A   No.
6      Q   Moving to the next page, you refund the PayPal payment
7          the day after you received it?
8      A   Yes.
9      Q   So did contact end there?
10     A   For a moment.
11     Q   Now, in January, did you actually call the police or
12         call the cops?
13     A   Yes.
14     Q   Okay.  And did you also consider other options with the
15         judiciary?
16     A   No.
17     Q   In January of 2016, did you seek any help from the
18         courts?
19     A   Yes, after I had called the police.
20     Q   And what did you do in terms of the courts?
21     A   I petitioned for a harassment/restraining order.
22     Q   How did you find out about harassment/restraining
23         orders?
24     A   When I called the police that night, they said that
25         there was nothing they could do if -- unless he would
```

—252—

CASE 0:19-cv-03051-SRN-HB   Document 88   Filed 04/06/20   Page 58 of 137

Filed in District Court
State of Minnesota
4/8/2019 4:26 PM

| | | |
|---|---|---|
| 1 | | threaten me with violence, unless I had a |
| 2 | | harassment/restraining order. |
| 3 | Q | When did you call the police?  Do you know? |
| 4 | A | It was either the same night that I got those messages |
| 5 | | or it was the next day. |
| 6 | Q | Did you actually see a police officer? |
| 7 | A | Yes. |
| 8 | Q | He came to your door? |
| 9 | A | Yes. |
| 10 | Q | And the officer told you, I can't do anything unless |
| 11 | | you get a harassment/restraining order? |
| 12 | A | That was true, okay.  So I didn't see the police -- I |
| 13 | | didn't see them that night.  I called them and I had a |
| 14 | | conversation -- I think it was with a dispatcher.  The |
| 15 | | police didn't come over until later. |
| 16 | Q | Okay.  So you called the police for help and you called |
| 17 | | the police line that got you to the dispatcher? |
| 18 | A | Yes. |
| 19 | Q | Shortly after the PayPal e-mails of the third week in |
| 20 | | January? |
| 21 | A | Yes. |
| 22 | Q | And you were calling to get some sort of police |
| 23 | | response, and you were told, get a |
| 24 | | harassment/restraining order? |
| 25 | A | Yes. |

-253-

1    Q   Had you heard of one before?

2    A   I had heard of restraining orders before, yes.

3    Q   Okay.  So when the police officers told you about the

4        harassment/restraining order, what went through your

5        mind?

6    A   I mean, I was troubled that I couldn't get assistance

7        without filing a bunch of paperwork, but I was willing

8        to do it, because at that point -- I mean, when you

9        throw out a whole bunch of boundaries and somebody

10       ignores them, there are certain things that you have to

11       do.

12   Q   So what did you do to try to go about getting a

13       harassment/restraining order?  What steps did you take?

14   A   I don't remember what order I did this, but I called

15       the -- I think I went on the website that is supposed

16       to instruct you as to how to do this, and I visited two

17       different offices.  I visited the Domestic -- I think

18       it's the Domestic Abuse & Harassment Office in the

19       Juvenile/Family Courthouse, but I also went to Bridges

20       to Safety downstairs, and I filed the paperwork with

21       either of those offices.  I think one of them -- I got

22       a copy of, like, an outdated document from one, so I

23       went to the other.

24   Q   Okay.  So, basically, you're talking about working with

25       the courts through the court offices to try to get a

-254-



1        harassment order?

2    A   Yes.

3    Q   And part of your visit involved the

4        harassment/restraining office and part of your visit

5        involved going downstairs to something that's called

6        Bridges to Safety where you can apply for or petition

7        for such an order?

8    A   Yes.

9    Q   Did you go alone or with somebody else?

10   A   I think I was alone.

11   Q   And so you filled out the paperwork with the courts to

12       petition or apply for a harassment/restraining order?

13   A   Yes.

14   Q   Did you get one?

15   A   Yes.

16   Q   Okay.  You got a temporary order of sorts, correct?

17   A   Yes.

18               MR. CHRISTIE:  Your Honor, the State would

19       offer into evidence Exhibit 5, which is a certified

20       copy of the order granting the petition for an ex parte

21       harassment/restraining order.

22               MS. ZAUHAR:  No objection.

23               THE COURT:  Exhibit 5 shall be received into

24       evidence.

25   Q   (By Mr. Christie, continuing) And the salient part of

-255-

Filed in District Court
State of Minnesota
4/8/2019 4:26 PM

1       the restraining order is that the respondent, Mr.

2       Fredin, shall have no direct or indirect contact with

3       you, Ms. Miller, the petitioner; is that right?

4   A   Yes.

5   Q   No direct or indirect contact with you.  And then it

6       goes on to talk about visits and phone calls and any

7       electronic means, correct?

8   A   Yes.

9   Q   So you got this order from the court, correct?

10  A   Yes.

11  Q   Okay.  And you understood that the order also needed to

12      be served upon Mr. Fredin so that he would know about

13      the court order and the court action, correct?

14  A   Yes.

15          MR. CHRISTIE:  And, Your Honor, the State

16      would offer into evidence Exhibit 6, which is a

17      certified copy of the certificate of service of the

18      order upon Mr. Fredin on February 2, 2016.

19          THE COURT:  Any objection?

20          MS. ZAUHAR:  No objection.

21          THE COURT:  Exhibit 6 shall be received.

22  Q   (By Mr. Christie, continuing) Were you notified when he

23      was served?

24  A   I think I called -- I might have called the sheriff to

25      ask if he was served or they might have notified me.  I

```
 1          don't recall how I was informed that he was served.
 2      Q   You don't have to go through the whole exhibit or
 3          order, but this is the order that we're talking about,
 4          right?
 5      A   Yes.
 6      Q   Grace Elizabeth Miller versus Brock Fredin?
 7      A   Yes.
 8      Q   And at the top of page two, the no-contact provisions,
 9          correct?
10      A   Yes.
11      Q   And at the time, where did you live?
12      A   I lived in St. Paul, Minnesota.
13      Q   The address where you lived?
14      A   Yes, 1660 -- 1656 Dayton Avenue.
15      Q   What kind of residence is that?
16      A   It's a -- it's a house, and I live in the bottom floor.
17          It's a duplex.
18      Q   Okay.  Do you still live there?
19      A   Yes.
20      Q   And this is a certificate of service, but this didn't
21          really involve you at all, did it?
22      A   No.
23      Q   It was the sheriff's department that was doing the
24          service, not you, correct?
25      A   Yes.
```

1    Q   The court's doing it on your behalf?

2    A   Yes.

3    Q   So you got the order.  How did that make you feel?

4    A   A little apprehensive, I guess.

5    Q   Why?

6    A   Well, what's going to happen now.

7    Q   Were you going to poke the bear?

8    A   No.

9    Q   That was what you were afraid of?

10   A   I -- by "poke the bear," I meant I didn't do this to

11       harass him.  I was afraid that there would be some sort

12       of response.

13   Q   Okay.  And he was given the order on February 2.  Was

14       there any response or contact from Mr. Fredin on

15       February 2?

16   A   No.

17   Q   Or the week thereafter?

18   A   Yes.

19   Q   When?

20   A   February 9.

21   Q   And what sort of reaction or contact did you learn of

22       on February 9?

23   A   I went back on match.com, and I -- I didn't know that

24       he was still using the site, but I immediately saw his

25       face when I opened the program.



```
1    Q    Okay.  So February 9, you're going on match.com.  Why
2         were you going on match.com that day?
3    A    I guess at that point, against my better judgment based
4         on what I had been through, I thought maybe I would try
5         this again.
6    Q    Looking for somebody else?
7    A    Yes.
8    Q    A week after your restraining order is served?
9    A    Yup.
10   Q    All right.  And when you go on match.com, for those of
11        us that haven't been online at match.com, what are you
12        looking at on the computer when you kind of login?
13   A    Well, it shows you, like, different people, like,
14        different profiles you might be interested in, and that
15        sort of thing.
16   Q    Okay.  And, of course, you have your profile out there,
17        right?
18   A    Yes.
19   Q    Okay.  And how do you know if somebody's interested in
20        your profile as well as, you know, who might be
21        interested in you, in addition to you looking for
22        others?  So how do you know if somebody's interested in
23        you and looking at your profile?
24   A    Well, when someone clicks on your profile, you see a
25        little blurb of -- just like a snapshot of their
```

-259-



```
 1            profile, with their face, and some information about
 2            them appears on your screen.  And there's also a blurb
 3            of information and there's a list of everybody who
 4            looked at your profile.  And so you see all of those
 5            people and a blurb of their profile on there, too.
 6     Q      So if I understand this correctly, if somebody's
 7            interested enough in you to click on your profile, you
 8            get some sort of blurb or notification so you know that
 9            somebody's interested?
10     A      Yes.
11     Q      And if it's one person, you see one blurb, if it's two
12            people -- different people, you see two different
13            blurbs; is that right?
14     A      Yes.  As they click on you, their face will show up.
15     Q      So does -- this sort of notification of clicking on
16            your profile, does this happen in any sort of
17            chronological order?
18     A      Yes.
19     Q      Okay.  And so you can tell how many people have clicked
20            on your profile, but you can also see who was the
21            latest one to click or who was the first one?
22     A      Yes.
23     Q      Based on the order in the queue?
24     A      Yes.
25     Q      And so you went on match.com, looking for another
```

—260—

1        possible candidate for a relationship, and what did you

2        find on February 9, 2016?

3    A   Well, I saw -- saw Mr. Fredin's face, and when I went

4        to look at my profile views, he was at the top of the

5        list.  So he had been the most recent person to look at

6        my profile.

7    Q   And you had met Mr. Fredin through match.com?

8    A   Yes.

9    Q   So, presumably, he knew how match.com works?

10   A   Yes.

11   Q   Knew how the profile system works?

12                MS. ZAUHAR:  Objection, speculation.

13                THE WITNESS:  Yes.

14                THE COURT:  Hold on, Ms. Miller.

15            Counsel, can you repeat the question?

16                MR. CHRISTIE:  I'll rephrase the question.

17                THE COURT:  Thank you.

18   Q   (By Mr. Christie, continuing) You had communications

19       through match.com with Mr. Fredin?

20   A   Yes.

21   Q   To the best of your understanding, is the way that

22       match.com works for you the same as match.com works for

23       every other person on match.com?

24   A   Yes.

25   Q   It's a nationwide service, correct?

261

1    A    Yes.

2    Q    It's a platform that many people use, correct?

3    A    Yes.

4    Q    And on February 9, you see some sort of face of Mr.

5         Fredin in what context?

6    A    So the blurb shows up, you know, in one place on your

7         profile and then I saw this same snapshot in my list of

8         profile views at the top.

9    Q    Okay.

10              MR. CHRISTIE:  May I approach, Your Honor?

11              THE COURT:  You may.

12   Q    (By Mr. Christie, continuing) Ms. Miller, I'm showing

13        you what's been marked for identification as Exhibit 7.

14        Could you tell us what this is?

15   A    This is a screenshot of the -- I guess I call it a

16        blurb -- the blurb of Brock's profile that showed up

17        when I looked at the list of people who had viewed my

18        profile.

19   Q    Who made this document?

20   A    Mr. Fredin made it.

21   Q    Okay.  And who copied the document for the purposes of

22        this case?

23   A    The document -- I made the document.

24   Q    Okay.  And how did you make the document?

25   A    I just took a partial screenshot from my computer.

 1    Q    So you can take screenshots on the computer like you

 2         can take screenshots on your phone?

 3    A    Yes.

 4    Q    And you wanted to preserve this blurb with Mr. Fredin's

 5         face?

 6    A    Yes.

 7              MR. CHRISTIE:  The State would offer into

 8         evidence Exhibit 7, Your Honor.

 9              MS. ZAUHAR:  No objection.

10              THE COURT:  Exhibit 7 shall be received.

11    Q    (By Mr. Christie, continuing) Why did you take the

12         screenshot?

13    A    Because I knew it was a violation of my restraining

14         order, and if he was continue to find ways to contact

15         me, I thought that I should document it.

16    Q    That's a photograph of Mr. Fredin?

17    A    Yes.

18    Q    And underneath it, it says, GopherBadge, 32, St. Paul,

19         Minnesota.  Do you have any idea what was meant by

20         Gopher Badge?

21    A    No, not really.

22    Q    Now, when people on match.com -- does anyone use their

23         true and correct names?

24    A    No.

25    Q    Do some people use aliases, names of other people?

—263—

1    A    Yes.

2    Q    Do some people use nicknames or pet names and that sort

3         of thing?

4    A    Yes.

5    Q    Okay.  Why would someone not use their true and correct

6         name on a match.com profile?

7    A    I think most people don't use their name.  It's usually

8         just something they adopt, a screen name.

9    Q    That's part of that caution at the beginning that we

10        were talking about earlier?

11   A    I think so.

12   Q    Okay.  Any doubt in your mind that that came from Mr.

13        Fredin?

14   A    No.

15   Q    Seeking women 18 to 39.  I presume that's age; is that

16        right?

17   A    Yes.

18   Q    What's under the "seeking women 18 to 39"?

19   A    To a lost love.  Incredibly sorry, Grace.  Sorry for

20        what happened.  Never intended anything of that nature.

21   Q    And then you can click on a link to read more?

22   A    Yes.

23   Q    Did you click on that link?

24   A    At first, I bought an extension to the app where you

25        can click on people's profiles without them seeing that

-264-

1    you did.  So you don't get the blurb, you don't get the

2    -- it doesn't go on the page of those -- you know, the

3    ones that you do, because I didn't want him to know

4    that I saw it.  So I clicked on it after I got that.

5  Q    Is that an application that match.com provides or

6    through a different service?

7  A    It's from match.com.

8  Q    So you can post things and click on people's profiles

9    without them knowing that you clicked on their profile?

10  A    Yes.

11  Q    But there's another feature that if you click on the

12    profile, it'll show this type of blurb?

13  A    Yes.

14  Q    So the user has a choice between -- whether or not to

15    let the receiver see the blurb or not?

16  A    Yes.  It costs more to, you know, be invisible, so they

17    can't tell, but it's an option.

18  Q    Part of the service package, if you want?

19  A    Yes.

20  Q    And you paid for that extra service?

21  A    Yes.

22  Q    How much does that cost?

23  A    I think it was, like, $5 for a month.

24  Q    And you, in the lower right-hand corner, viewed on

25    February 9, 2016 -- that's your viewing date?

265

1    A    That's the date that he viewed me.

2    Q    His viewing date?

3    A    Yes.

4    Q    So you clicked on the "to a lost love" posting, right?

5    A    Yes.

6    Q    You wanted to read all of it?

7    A    Yes.

8    Q    If you didn't want him to have any contact and you

9         wanted him to leave you alone, why would you go looking

10        at the whole letter instead of just turning off your

11        computer or exiting out of match.com?

12   A    Well, partly because I wanted to document it.  In case

13        I needed to give it to the police, I wanted to have an

14        accurate copy of what he was saying.  And, also, the

15        idea of him posting about me publicly on the Internet

16        made me really uncomfortable.  It's a public page.

17        Anybody who is on the site can see it.  I have friends

18        that use the site, and I was concerned about what he

19        was saying.

20   Q    But it's on his profile page?

21   A    Yes.

22   Q    But anyone can basically see it if they're on

23        match.com?

24   A    Yes.

25   Q    And how did you know that "to a lost love" involved

1          you?

2     A    Because it had my name on it.

3     Q    Incredibly sorry, Grace?

4     A    Yes.

5                    MR. CHRISTIE:  Your Honor, may I approach?

6                    THE COURT:  You may.

7     Q    (By Mr. Christie, continuing) I'm showing you what's

8          been marked for identification as Exhibits 8, 9, and

9          10.  Could you tell us what these are?

10    A    They are three different versions of his profile.

11    Q    And did you create these documents for the purpose of

12         the police investigation?

13    A    Yes.

14    Q    And how did you do that?

15    A    I took screenshots from my computer.

16                   MR. CHRISTIE:  And the State would offer into

17         evidence Exhibits 8, 9, and 10, Your Honor.

18                   MS. ZAUHAR:  We have no objection.

19                   THE COURT:  Exhibits 8, 9, and 10 shall be

20         received into evidence.

21    Q    (By Mr. Christie, continuing) It looks like there's

22         some handwriting immediately above and immediately

23         below each of these posts.  Who wrote that?

24    A    I did.

25    Q    Okay.  Basically, you're identifying when it was posted

Filed in District Court
State of Minnesota
4/8/2019 4:26 PM

1    and then you signed your name at the bottom, for some

2    reason?

3  A    Yes.

4  Q    Okay.  And how did you provide these exhibits to the

5    police?

6  A    I think I printed them out, because I wrote the time

7    and date on them, and then I -- since I considered

8    this a restraining order violation, I called the

9    police, and they did come to my house that time.

10  Q    And that's on February 10, 2016?

11  A    I think so.

12  Q    And so the officer came to your house.  That's Officer

13    Ly, L-Y, correct?

14  A    Yes.

15  Q    And you gave him these documents and basically told him

16    the initial account of the restraining order violation,

17    in your view?

18  A    Yes.

19  Q    We can all kind of read this to ourselves at this

20    point.  It doesn't seem particularly upsetting.  It

21    seems like it's in the nature of an apology.  How did

22    you react to this?

23  A    It -- I was just kind of in disbelief that even after

24    going through all of the motions that I did to get him

25    to leave me alone, he -- he was trying to find ways

-268-

1       around the restraining order.

2   Q   And did you believe what you read?

3   A   Well, he said a couple things that I would disagree

4       with.  I would never hurt you emotionally intentionally

5       or cross any of your boundaries, and he had crossed

6       every single boundary that I had set.

7   Q   Did you ever give him any reason to believe that his

8       income was important to you?

9   A   No.

10  Q   So you read this, and it's an apology.  Why don't you

11      want other people to know that Mr. Fredin was

12      apologizing for his wrongs to you?

13  A   It wasn't just that.  It was also the fact that he -- I

14      went on match.com not even knowing that he was still

15      using the site and not looking for him at all, and he

16      appeared.

17  Q   So what did you do, if anything, after you read this

18      version of "to a lost love" posted February 9 at about

19      ten in the evening?  What did you do?

20  A   I sent him a message that said, not cool, take my name

21      off of your profile, and leave me alone.

22  Q   And by what means did you send him this message?

23  A   I sent it through match.com.

24  Q   So you can message through match.com?  Like, you can

25      send e-mails?

Filed in District Court
State of Minnesota
4/8/2019 4:26 PM

1    A    Yes.

2    Q    And did he reply directly to your message when you

3         said, not cool, take it down?

4    A    No.  He revised the posting on his profile.

5    Q    So we have a second posting about 7:30 in the morning

6         the following day, February 10; is that right?

7    A    Yes.

8    Q    To a lost love, I'm sorry.  I wish I could erase the

9         past.  You touched my heart.

10            In what ways did this second version change in any

11        important way, from your perspective?

12   A    He's just continuing the argument and still not taking

13        "no" for an answer.

14   Q    I'll do anything to speak with you again.  How did you

15        reply?

16   A    I told him that I was serious, and this is the reason

17        that I got a restraining order.

18   Q    Did you use any emphatic words the second time?

19   A    I think I said, 100 percent f'ing serious.

20   Q    There's that "f" word again?

21   A    Yes.

22   Q    Take it down.  I'm serious.

23            Did he take it down?

24   A    No.

25   Q    Third public post, an hour and a half later, same

| | | |
|---|---|---|
| 1 | | morning of February 10, he didn't take it down, but he |
| 2 | | tweaked it a third time? |
| 3 | A | Yes. |
| 4 | Q | Or tweaked a second time, for a third document? |
| 5 | A | Yes. |
| 6 | Q | What did you make of this? |
| 7 | A | I was troubled that he wouldn't stop, but it -- it kind |
| 8 | | of started to escalate because he says that my behavior |
| 9 | | was, quote, early abusive, and he starts to speculate, |
| 10 | | saying that maybe this is because I have PTSD from |
| 11 | | being in the military. |
| 12 | Q | That stands for posttraumatic stress disorder? |
| 13 | A | Yes. |
| 14 | Q | And how did you react or feel when you read that |
| 15 | | sentence, perhaps you have PTSD from your military |
| 16 | | experience? |
| 17 | A | I was extremely upset. |
| 18 | Q | Why? |
| 19 | A | First of all, it's this person who has been harassing |
| 20 | | me for weeks saying that you're crazy.  This is your |
| 21 | | fault.  It's because of you gas-lighting me and saying |
| 22 | | that, you know, the fact that this isn't working out is |
| 23 | | because you're mentally unstable.  The other thing that |
| 24 | | upset me about it is, what if somebody I know sees |
| 25 | | this.  There aren't that many Graces in the military in |

—271—



```
 1              St. Paul, Minnesota, and PTSD is a big deal.  People --
 2              people's military careers end if they have severe
 3              mental health issues, and I don't want stuff like this
 4              being public.
 5    Q    You were a captain at the time with command over dozens
 6              of dozens of servicemen?
 7    A    Yes.  As a captain, I wasn't a squadron commander yet,
 8              but I supervised a lot of people.
 9    Q    So you had a lot of supervisory responsibilities?
10    A    Yes.
11    Q    And you were concerned about whether or not someone out
12              there would start wondering whether or not their
13              supervisor had mental health problems?
14    A    Yes.
15    Q    PTSD, that might end your military career?
16    A    Yes.
17    Q    Oh, that Grace Miller with the Air Force?
18    A    Yes.
19    Q    Is this the first time that you had been identified on
20              match.com as being in the military?
21    A    Yes.
22    Q    So how did you reply to this third letter, to a lost
23              love?
24    A    I didn't reply to that one.  I just called the police.
25    Q    And that eventually brought you into contact with
```

—272—

1        Officer Ly and Sgt. David McCabe, correct?

2    A   Yes.

3    Q   Okay.  You worked with Sgt. McCabe, providing him with

4        some of the documentation that we've gone through here

5        today?

6    A   Yes.

7    Q   Okay.

8                MR. CHRISTIE:  If I might just have one

9        moment, Your Honor?

10               THE COURT:  Certainly.

11               (Whereupon, Mr. Christie reviewed his notes.)

12               MR. CHRISTIE:  Your Honor, I have no further

13       questions for Ms. Miller at this time, subject to the

14       possibility of redirect.

15               THE COURT:  The time is 3:05.  This is a good

16       point to also take our mid-afternoon break.  Let us

17       take a ten-minute break and resume at 3:15.  You may at

18       this time exit the courtroom.  When you are done with

19       your break, please go back into the conference room,

20       and my law clerk will come out and retrieve you when we

21       are ready.

22           All rise, for the jury, please.  Thank you.  You

23       may exit.

24               (Whereupon, the clerk escorted the jurors

25       from the courtroom.)

1          THE COURT:  Thank you, everyone.  You may be

2     seated.

3          Anything that the attorneys want to put on the

4     record?

5          MR. CHRISTIE:  Not at this time.

6          MS. ZAUHAR:  No, Your Honor.

7          THE COURT:  All right.  We'll see you in ten.

8     The court stands in recess.

9          (Whereupon, a short recess was held.)

10         THE COURT:  We are back on the record in the

11    State of Minnesota versus Mr. Brock Fredin.  At this

12    time, we took a brief recess, allowing the jury to be

13    able to step down, take a break.  Ms. Zauhar is about

14    to commence her cross-examination.  It is my preference

15    to have Ms. Miller back on the stand and be ready to

16    go.  So when the jury comes in, then we can just

17    continue.

18         (Whereupon, Ms. Miller resumed her seat on

19    the witness stand.)

20         THE COURT:  The record should reflect that

21    all the parties are back in the courtroom.  Mr.

22    Christie, on behalf of the State of Minnesota, is

23    present.  Ms. Zauhar is present, on behalf of her

24    client, Mr. Fredin, and Mr. Fredin is also present.

25         (Whereupon, the clerk stepped out of the

—274—

```
 1        courtroom briefly and returned with the members of the

 2        jury.)

 3              THE COURT:  Ms. Miller, I want to remind you

 4        that you are still under oath.  At this time, I will

 5        turn it over to Ms. Zauhar.

 6           Counsel.

 7              MS. ZAUHAR:  Thank you.

 8                   CROSS-EXAMINATION

 9   BY MS. ZAUHAR:

10   Q    Good afternoon, Ms. Miller.

11   A    Good afternoon.

12   Q    Now, I just have a few follow-up questions for you,

13        based on your testimony.  You described that you first

14        began dating Mr. Fredin in September of 2015; is that

15        right?

16   A    Either -- yeah, either end of August or early

17        September.

18   Q    Okay.  So either August or September, but we're not

19        sure on the exact date?

20   A    Yes.

21   Q    And you went on several dates with him, right?

22   A    Yes.

23   Q    And it sounds like with most people you -- you had a

24        first date with most people you met on match.com,

25        right?
```

| | | |
|---|---|---|
| 1 | A | Uh-huh. |
| 2 | Q | Yes? |
| 3 | A | Yes. |
| 4 | Q | But with Mr. Fredin, the relationship grew into |
| 5 | | frequent dates? |
| 6 | A | Yes. |
| 7 | Q | I believe you described that at least at one point, you |
| 8 | | were seeing each other several times per week.  Is that |
| 9 | | accurate? |
| 10 | A | Yeah, maybe twice a week or so. |
| 11 | Q | Okay.  And is it fair to say, you had a good time with |
| 12 | | him? |
| 13 | A | Yes. |
| 14 | Q | You liked him? |
| 15 | A | Yes. |
| 16 | Q | He liked you? |
| 17 | A | Yes. |
| 18 | Q | You liked him more than the other people you were |
| 19 | | dating.  Is that also fair to say? |
| 20 | A | Yes. |
| 21 | Q | Now, you described that on a lot of your dates, you |
| 22 | | would go out to dinner, mostly, correct? |
| 23 | A | Yes. |
| 24 | Q | You went to a play one time? |
| 25 | A | Yes. |

1    Q    And he would come over to your place?

2    A    Yes.

3    Q    Did you ever go to his place?

4    A    I think once.  Just after he moved, I went to see his

5         new apartment.

6    Q    Okay.  And it sounds like on at least one occasion, you

7         had made a meal for him at your place, correct?

8    A    Yes.

9    Q    And when you described going on dates with him a few

10        times a week, when approximately do you think that was?

11   A    Probably September-October time frame.

12   Q    During your relationship with him, you communicated

13        over a variety of media, it sounds like, right?

14   A    Yes.

15   Q    You communicated using the match.com website?

16   A    Yes.

17   Q    And that has -- I believe Mr. Christie referred to it

18        as an e-mail feature, but kind of, like, a messaging

19        feature?

20   A    Yes.

21   Q    Where you can directly and privately message another

22        user?

23   A    Yes.

24   Q    Okay.  So that's what you meant when we're talking

25        about e-mailing him on match?



1   A   Correct.

2   Q   And you would communicate over Facebook message?

3   A   Yes.

4   Q   You would communicate over text messages on your cell

5       phones, correct?

6   A   Yes.

7   Q   And it sounds like, Mr. Fredin had at least two numbers

8       that he would text you with that you knew of, correct?

9   A   Yes.  One was more typical than the other.

10  Q   One was more typical than the other?

11  A   Yes.  Normally, it was the -- I think the 5512 number

12      was the one that he used.

13  Q   Okay.  That's the number you usually used to contact

14      him?

15  A   Yes.

16  Q   And would you talk over the phone, ever?

17  A   Yes, sometimes.

18  Q   Okay.  And, of course, you would also communicate in

19      person when you saw each other, right?

20  A   Yes.

21  Q   And through September and October -- or at least part

22      of October, you were, during that point, exclusively

23      dating each other, correct?

24  A   Yes.

25  Q   You testified that you had kissed once?

—278—

1   A   Like, it was normally just a peck on the cheek or, you

2       know, just casual and stuff.  Only once did we

3       actually, like, sit on a couch and kiss, you know.

4   Q   Okay.  It's more -- I'll use the phrase "making out."

5       You made out one time?

6   A   Yeah, once.

7   Q   Okay.  No sex, though, right?

8   A   No.

9   Q   You mentioned that at some point during this part of

10      the relationship, Mr. Fredin asked you about your

11      sexual history with other men, correct?

12  A   Yes.

13  Q   And I don't remember the words you used, but that

14      question -- it sounded like maybe you were

15      uncomfortable, right?

16  A   Yes.

17  Q   Fair to say, that's a somewhat normal question to ask

18      someone you've been seeing exclusively for quite some

19      time.  Is that fair?

20  A   It is fair.  The way -- it was the way he asked it that

21      made me uncomfortable.

22  Q   Okay.  So you didn't like the way that he asked you

23      this question?

24  A   Yes.

25  Q   Okay.  And sometime in October, you broke up with him?

-279-

62-CR-17-3156

CASE 0:19-cv-03051-SRN-HB   Document 88   Filed 04/06/20   Page 85 of 137   Filed in District Court
State of Minnesota
4/8/2019 4:26 PM

1    A    Yes.

2    Q    And you broke up with him.  I believe you said, he --

3         it felt a little possessive or too serious?

4    A    Yes.

5    Q    He was talking about marriage, that type of thing?

6    A    Yes.

7    Q    And that was too much for you at that time?

8    A    Yes.

9    Q    After you broke up with him, you began to date again at

10        some point, correct?

11   A    I think we saw each other a couple times after that,

12        and I said, yes, we can still go on casual dates, but

13        this is too serious as it is.

14   Q    Okay.  And about how long after breaking up did you see

15        each other again or begin dating again?

16   A    I don't know.  Like, a week or two, maybe.

17   Q    Okay.  So maybe a week or so in between that you did

18        not see each other?

19   A    Yes.

20   Q    And you talk about this last date you had at the Irish

21        pub.  When do you think that was?

22   A    Again, I can't -- I can't remember the exact date, but

23        I know that it was -- it was probably in November --

24        early November, before -- it was definitely before

25        Thanksgiving, because that's when I went to Germany.

```
1    Q    Okay.  So that date was after your first breakup, but
2         before the December breakup, correct?
3    A    Yes.
4    Q    And you think, after the first breakup, you saw each
5         other in person maybe a couple times?
6    A    Yes.
7    Q    And then you had your trip to Germany at that point and
8         didn't see each other for a couple weeks, right?
9    A    I don't think we saw each other at all after I went to
10        Germany.
11   Q    Okay.  So once -- during your trip to Germany, you were
12        Facebook messaging for communication, correct?
13   A    Yes.
14   Q    Did you talk over the phone at all when you were in
15        Germany?
16   A    I don't -- I don't think so.
17   Q    Did you text message?
18   A    No.  I think -- I think I just used Facebook, because
19        it's -- it's more expensive to text when you're in a
20        foreign country.
21   Q    International?
22   A    Yes.
23   Q    And so Facebook, it's free, regardless of where you
24        are, correct?
25   A    Yes.
```

1    Q    Now, when did you return from Germany?

2    A    It would have been just a couple days after

3         Thanksgiving.

4    Q    And Mr. Christie talked to you a lot about a series of

5         Facebook messages that occurred over December 3 through

6         8.  You remember those Facebook messages, right?

7    A    Yes.

8    Q    And those messages we discussed are clips or a portion

9         of your Facebook conversation that you put together for

10        law enforcement, correct?

11   A    Yes.

12   Q    And that isn't -- it's not a full version of the

13        conversation during those dates, correct?

14   A    Correct.

15   Q    Now, let me -- let me back up just a little bit about

16        your Facebook conversation.  Before December 3, is it

17        fair to say your Facebook conversation was somewhat

18        normal relationship-type stuff?

19   A    It was -- I think there was a little possession

20        starting to happen.

21   Q    Sure.

22   A    Stuff like, be a good girl for me, and that sort of

23        thing.

24   Q    And you testified about that?

25   A    Yes.

-282-

1    Q    And other than that, you would talk about work or

2         school?

3    A    Uh-huh, yes.

4    Q    You would talk about books you were reading?

5    A    Yes.

6    Q    You would talk about going out on dates, right?

7    A    Yes.

8    Q    And as you testified, there was perhaps was an argument

9         or two about control in the relationship, right?

10   A    Yes.

11   Q    And was that a common argument topic for the two of

12        you?

13   A    Not at first, it wasn't.  Eventually, it did become a

14        common topic.

15   Q    Because it -- again, correct me if I'm wrong, but you

16        -- you took issue with the fact that he would tease

17        that you were the man of the relationship, right?

18   A    Yes.

19   Q    Because that's not what you wanted in a relationship,

20        right?

21   A    Right.

22   Q    And you told him that?

23   A    Yes.

24   Q    Now, Ms. Miller, I'm showing you a document that's been

25        previously marked for identification as Exhibit 51.  Do

1            you recognize that document?

2    A    Yes.

3    Q    And what is it?

4    A    This is more of the Facebook messages.

5    Q    What is the date that those messages begin?

6    A    December 2.

7    Q    And does this appear to be a fair and accurate

8         representation of your Facebook messages with Mr.

9         Fredin?

10   A    Yes.

11            MS. ZAUHAR:  Your Honor, may I offer Exhibit

12        51?

13            MR. CHRISTIE:  No objection, Your Honor.

14            THE COURT:  Exhibit 51 shall be received into

15        evidence.

16            MS. ZAUHAR:  Thank you.

17   Q    (By Ms. Zauhar, continuing) Ms. Miller, I'll let you

18        hang onto that for a little bit, because I want to ask

19        you some questions about it.  On this first page of the

20        exhibit, it begins by -- on December 3, it begins by

21        Brock telling you he misses you, right?

22   A    Yes.

23   Q    Are you back from Germany at this point?

24   A    Yes.

25   Q    Okay.  But you had not seen each other since you got

```
 1            back?
 2    A       Correct.
 3    Q       And he tells you, you're beautiful, and he mentions his
 4            birthday coming up?
 5    A       Yes.
 6    Q       And you tell him, that's exciting, and you say, and,
 7            yes, I am very beautiful?
 8    A       Yes.
 9    Q       And that was being playful, right?
10    A       Yeah, just kind of a way to -- I don't know.  Sometimes
11            he would give me these superlative compliments, and I
12            didn't know how to take them.
13    Q       Sure.  Now, turn the page to December 4, those
14            messages, and towards the bottom of the conversation --
15            the conversations begins with Mr. Fredin asking you if
16            you're dating others, correct?
17    A       Yes.
18    Q       And you tell him that you have been on a few first
19            dates?
20    A       Yes.
21    Q       And he says, that is dating, you are kind of a joke,
22            right?
23    A       Yes.
24    Q       And so he doesn't seem very happy that you've been
25            dating other people, correct?
```

Filed in District Court
State of Minnesota
4/8/2019 4:26 PM

1    A    Correct.

2    Q    Now, turning the page again, there's no dates on this

3         page.  I'll try to direct you the best that I can.  Mr.

4         Fredin is continuing this conversation.  About a third

5         of the way down, he says, anyways, I do lime [sic] you.

6         I think it's supposed to be like you.  You're just

7         afraid of feelings.  Do you see that part?

8    A    Yes.

9    Q    And he is suggesting that he feels that there's not

10        enough communication in your relationship?

11   A    Yes.

12   Q    And this is when you also mention to him that you don't

13        like your relationship dynamic and you don't like how

14        he keeps joking about you being the man in the

15        relationship, right?

16   A    Yes.

17   Q    And you say, I was starting to feel like it's true, and

18        I don't want that?

19   A    Yes.

20   Q    Now, towards the bottom of the conversation, he says,

21        you need to communicate more, tell me about the things

22        that make you feel comfortable/connected, so I can give

23        those to you, correct?

24   A    Yes.

25   Q    And that is where the two of you also discuss that you

-286-

Filed in District Court
State of Minnesota
4/8/2019 4:26 PM

1          both generally have a good time together, correct?

2     A    Yes.

3     Q    Now, turning the page again -- and this exhibit will be

4          made available for the jury to review during

5          deliberations.  About a third of the way or halfway

6          down the page, Mr. Fredin tells you that he's done

7          fighting for you, right?

8     A    Yes.

9     Q    He says, I can see you aren't interested, and I don't

10         want to waste my time, right?

11    A    Yes.

12    Q    And you, again, tell him that you're sorry and that you

13         can just be friends and maybe go out on the occasional

14         date, correct?

15    A    Yes.

16    Q    Turning the page again, right before the photo or the

17         meme that you sent him, you again suggest that the two

18         of you can be friends and you will take him out for his

19         birthday, correct?

20    A    Yes.

21    Q    And, you know, throughout this conversation are

22         portions of the messages that you provided to law

23         enforcement; is that fair?

24    A    Yes.

25    Q    And portions that you have previously discussed with --

```
 1              in front of the jury with Mr. Christie, correct?
 2      A       Yes.
 3      Q       Okay.  And now on -- please move forward a few pages to
 4              December 5, 2015.  The argument is continuing; is that
 5              fair to say?
 6      A       Yes.
 7      Q       And he asks you to go out for a drink that night, and
 8              you tell him, you are hanging out with your sister and
 9              some dogs, right?
10      A       Yes.
11      Q       You send him a picture of the dogs?
12      A       Yes.
13      Q       And he comments that he loves dogs, and you say, we
14              just put them to bed, right?
15      A       Yes.
16      Q       And on that same day, December 5, he sends you a photo
17              of himself, and he has some arrows pointing to various
18              books and arrows pointing to Settlers of Catan?
19      A       Yes.
20      Q       Did I say that right?
21      A       Yes -- well, actually, I have no idea what that is, so
22              I don't know.
23      Q       Okay.  So it appears to be that word?
24      A       Yes, I suppose.  Settlers of Catan.
25      Q       And you tell him, you approve of this picture because
```

—288—



1    he doesn't look mopey in it, right?

2  A  Yes.  We had talked about the fact that he needed to

3    smile in pictures.

4  Q  Okay.  So you tell him that on December 5, that you

5    approved of that photo he sent you, right?

6  A  Yes.

7  Q  And then shortly thereafter is where the jury will be

8    able to see that the photo of the leather lingerie was

9    sent to you, correct?

10 A  Yes.

11 Q  And that was still on December 5?

12 A  Yes.

13 Q  And then moving forward to December 6, I think it's two

14   pages ahead, he sends you another photo of himself,

15   correct?

16 A  Yes.

17 Q  And below that is where you are continuing the argument

18   and you give him his three choices?

19 A  Yes.

20 Q  Okay.  And you discussed those three choices in your

21   testimony, correct?

22 A  Yes.

23 Q  And, again, on that same date -- and this is after a

24   lot of the argument you discussed with Mr. Christie had

25   occurred -- you are again telling him that you will

1      still take him out for his birthday, as friends,

2      correct?

3    A   Yes.

4    Q   And he tells you, at the bottom there, that he enjoys

5      seeing you and still likes to do small things for you,

6      correct?

7    A   Yes.

8    Q   On that same date, going to the bottom of the next

9      page, he asks you, can you please forgive me, Grace,

10     I'm sorry, correct?

11   A   Yes.

12   Q   You say, yeah, I can forgive you, but I'm not going out

13     with you, right?

14   A   Yes.

15   Q   And he says, please, let's still go on the occasional

16     date, Grace, I was just seeing if you were into alpha

17     guys, it was a thought experiment, I want to do so much

18     for you, right?

19   A   Yes.

20   Q   What did that mean to you?

21   A   He was, I guess, trying to justify the aggressive

22     language that he had used before.

23   Q   Telling you that he was trying to be more alpha, is the

24     word he used?

25   A   Yes.

—290—

Filed in District Court
State of Minnesota
4/8/2019 4:26 PM



1   Q   And seeing if you liked that?

2   A   Yes.

3   Q   Because you had previously been arguing about who had

4       more control in your relationship, correct?

5   A   I wouldn't say it was an argument about who had more

6       control.

7   Q   It was an argument about who was the man of the

8       relationship.  Is that what you testified to earlier?

9   A   Yes.

10  Q   Okay.  That conversation continues.  And then turning

11      the page to the next date, December 6, he again

12      apologizes and asks you how the zombie show was, you

13      got me partially into it.  Do you see that?

14  A   Yes.

15  Q   What zombie show was he talking about?

16  A   Walking Dead.

17  Q   Okay.  Is that a show you like?

18  A   Yes.

19  Q   And you reply to him, it wasn't on tonight.

20      Apparently, last weekend was the mid-season finale.

21      Who knew?  I was so upset.  Right?

22  A   Yes.

23  Q   He says, I'm sorry.  In a compromising feat, to

24      compensate for the mid-season finale miss, I took some

25      Daryl-like arm photos for you.  They're ridiculous, but

|     |   |                                                                        |
|-----|---|------------------------------------------------------------------------|
| 1   |   | hilarious at the same time.  I'm sending them before I                 |
| 2   |   | go to sleep.  Smiley face.  Right?                                     |
| 3   | A | Right.                                                                 |
| 4   | Q | And you say, hmmm, okay?                                                |
| 5   | A | Yeah.                                                                  |
| 6   | Q | And then you guys kind of joke a little bit about the                  |
| 7   |   | photo that he sends you?                                               |
| 8   | A | Yes.                                                                   |
| 9   | Q | And you say, well, that's very sweet and the closest                   |
| 10  |   | thing to Daryl I'm getting today anyways, right?                       |
| 11  | A | Yes.                                                                   |
| 12  | Q | Who's Daryl?                                                           |
| 13  | A | One of the characters from the show.                                   |
| 14  | Q | And you like him or think he's cute?                                   |
| 15  | A | Yeah.                                                                  |
| 16  | Q | Okay.  So that's what that reference is to?                            |
| 17  | A | Yeah.                                                                  |
| 18  | Q | And Mr. Fredin says, butterflies and blushes, I'm                      |
| 19  |   | honored to do it for you.  Thanks for not laughing too                 |
| 20  |   | hard.  You're the most beautiful woman I know.  Right?                 |
| 21  | A | Uh-huh.                                                                |
| 22  | Q | Yes?                                                                   |
| 23  | A | Yes.                                                                   |
| 24  | Q | And this conversation was, again, after the leather                    |
| 25  |   | lingerie photo, correct?                                               |



```
 1    A    Yes.

 2    Q    It's after the arguments and conversations you

 3         described while testifying with Mr. Christie, correct?

 4    A    Correct.

 5    Q    And after telling him that you don't want to speak to

 6         him, correct?

 7    A    I had told him that several times after this.

 8    Q    Okay.  And you told him --

 9    A    It was midway through this conversation.

10    Q    Sure.  And you told him that a few times before this,

11         too, correct?

12    A    Yes.

13    Q    And then ultimately on -- I just want to confirm the

14         date here -- it looks like December 8 is the last day

15         of Facebook conversations, correct?

16    A    Yes.

17    Q    And now on December 9 is when Mr. Fredin sends you the

18         test message that you described with Mr. Christie,

19         right?

20    A    Yes.

21    Q    And so is it fair to say that text message was a

22         continuation of this Facebook argument?

23    A    Yes.

24    Q    And it was, basically, simultaneous to the Facebook

25         conversation ending?
```

—293—

1   A   No.  I think at some point I blocked his Facebook.  I

2       don't know if he knew that I did or not, but when you

3       block someone, it shows up that they're -- you know,

4       they don't appear online.  So I'm assuming he -- it

5       looked like I wasn't online and so he decided to text.

6   Q   Okay.  So he might not have known you blocked him at

7       that point?

8   A   Maybe not, no.

9   Q   And he texted you within 24 hours, maybe, of this

10      Facebook conversation ending?

11  A   Yes, I think so.

12  Q   And as a continuation of this conversation, right?

13  A   Yes.

14  Q   And those text messages spanned two days, December 9

15      and 10, right?

16  A   Yes.

17  Q   And that's when you had blocked all of his phone

18      numbers, like, not contact you anymore; is that fair to

19      say?

20  A   I blocked -- I told him, I'm trying to block his

21      number, stop, and I blocked the first two phone numbers

22      simultaneously, because I had to -- I had to go to

23      verizon.com and speak to an agent and get a new app

24      added to my phone plan and then block them.  So it took

25      a while.

62-CR-17-3156

CASE 0:19-cv-03051-SRN-HB   Document 88   Filed 04/06/20   Page 100 of 137   Filed in District Court
State of Minnesota
4/8/2019 4:26 PM

1    Q    Okay.  And while testifying earlier, you made a comment

2         about how you had locked your doors during the course

3         -- at some point of this Facebook conversation,

4         correct?

5    A    Yes.

6    Q    Because you were worries that Mr. Fredin was going to

7         come over?

8    A    Yes.

9    Q    But he didn't actually come over, right?

10   A    I don't think so, no.

11   Q    And he doesn't -- he has no history of sneaking to your

12        house or anything like that, correct?

13   A    He used to when I was, like, sick, and he would come

14        over and leave stuff on the doorstep, like, medicine,

15        food, and stuff.

16   Q    Oh, okay.  So he would -- if you were either sick,

17        didn't want him to come in, whatever, he would bring

18        you food or medicine, that type of thing?

19   A    Yeah.

20   Q    Okay.  And you thought that was nice or sweet at the

21        time?

22   A    At the time, yes.

23   Q    Okay.  But he has no history of, like, sneaking into

24        your house, like I said, correct?

25   A    No.

```
 1    Q    No?

 2    A    No.

 3    Q    You described the Facebook messages Mr. Fredin sent to

 4         you as possessive?

 5    A    Yes.

 6    Q    You just said, they were inappropriate?

 7    A    Yes.

 8    Q    You said, they were insulting?

 9    A    Yes.

10    Q    And you didn't hear from Mr. Fredin again until January

11         3, over e-mail, right?

12    A    Correct.

13    Q    So between December 10 and January 3, that's about 24

14         days?

15    A    Yes.

16    Q    More than three weeks?

17    A    Yes.

18    Q    And he sent you the single e-mail that we saw on the

19         screen, saying that he missed you and had the music

20         video on there?

21    A    Yes.

22    Q    Some romantic song or something like that?

23    A    Correct.

24    Q    And you told him -- well, you told him to stop.  You

25         responded to that e-mail, right?
```

62-CR-17-3156

CASE 0:19-cv-03051-SRN-HB    Document 88    Filed 04/06/20    Page 102 of 137    Filed in District Court
State of Minnesota
4/8/2019 4:26 PM



1    A    Yes.

2    Q    And he didn't send you any reply at that time?

3    A    Not at that time, no.

4    Q    You described a second e-mail chain from January 24.

5         So from the first e-mail, that's another three weeks

6         later, right?

7    A    Yes.

8    Q    January 3 to January 24, 21 days?

9    A    Yes.

10   Q    And this is the e-mail chain that he -- you receive an

11        e-mail notification that he sent to you a PayPal

12        payment, correct?

13   A    Correct.

14   Q    And that comes in through your e-mail?

15   A    Yes.

16   Q    And he also sent you an e-mail message along with that

17        PayPal e-mail, correct?

18   A    Yes.

19   Q    And that was all on January 24?

20   A    Yes.

21   Q    And it was after that that you blocked his e-mail?

22   A    No, it was before that, because when I got the PayPal

23        notification -- I blocked his e-mail after the January

24        3 iteration in the e-mail.  And then when I received

25        the PayPal notification, I thought to myself, I wonder

—297—

```
 1              if he's been e-mailing me, because you can't -- if you
 2              -- if you block someone on gmail, they just put those
 3              e-mails in your spam box.  It doesn't -- it never --
 4              it's not totally blocked.  It doesn't go away
 5              completely.  So when I got the PayPal notification, I
 6              went into my spam mailbox, and there were two e-mails
 7              there from him.
 8      Q       From January 24?
 9      A       Yes.
10      Q       And so when you block someone's e-mail, it's not like
11              the e-mails disappear.  They just go into a spam folder
12              so you don't see them, right?
13      A       Yes.
14      Q       And you have to take initiative to access that spam
15              folder and look for particular e-mails, correct?
16      A       Yes.
17      Q       So as you blocked those e-mails, the only reason you
18              saw them is because you went to look to see if he had
19              been e-mailing you, correct?
20      A       Yes.
21      Q       And is that where you found the January 24 e-mails that
22              we saw on the screen?
23      A       Yes.
24      Q       In your spam folder?
25      A       Yes.
```

—298—

62-CR-17-3156

CASE 0:19-cv-03051-SRN-HB   Document 88   Filed 04/06/20   Page 104 of 137   Filed in District Court
State of Minnesota
4/8/2019 4:26 PM

1   Q   And your reply to those e-mails told him you were

2       calling the police, right?

3   A   Yes.

4   Q   And that's what you did?

5   A   Yes.  Yeah.

6   Q   And that is -- it is also after that e-mail that you

7       sought a harassment/restraining order, correct?

8   A   Yes.

9   Q   And the judge ultimately granted that

10      harassment/restraining order request?

11  A   Yes.

12  Q   And that means that the judge made a finding that Mr.

13      Fredin had been harassing you, correct?

14  A   Correct.

15  Q   You did not get any additional e-mails, text messages,

16      or Facebook messages from him at that point, correct?

17  A   Correct.

18  Q   And then around -- or on February 9, that's when you

19      accessed your match.com profile again, correct?

20  A   Correct.

21  Q   And you had interacted with a number of individuals on

22      match.com, it sounds like, right?

23  A   Yes.

24  Q   That includes Mr. Fredin?

25  A   Yes.

1    Q   And he had, obviously, interacted with your profile in

2        the past, as well?

3    A   Yes.

4    Q   And you have no idea how many times he clicked on your

5        profile, correct?

6    A   Not exactly, no.

7    Q   Okay.

8    A   There's no number.

9    Q   And you don't know how many times you clicked on his

10       profile?

11   A   Correct.

12   Q   But your two profiles, match.com had a history of them

13       interacting with each other, fair to say?

14   A   Yes.

15   Q   And so his -- when you logged onto match.com, you saw

16       his face, is what you testified.  His profile came up

17       as having interacted with you, right?

18   A   Yes.

19   Q   And you also noticed a message -- or the beginning of

20       his profile, to a lost love, and then it said, very

21       sorry, Grace, or something along those lines, correct?

22   A   Yes.

23   Q   And was it at that point that you bought the invisible

24       feature for match.com?

25   A   Yes.

Filed in District Court
State of Minnesota
4/8/2019 4:26 PM

1    Q    Okay.  You hadn't purchased that prior?

2    A    No.

3    Q    Okay.  And you purchased that invisible feature so you

4         could check Mr. Fredin's profile without him knowing

5         you were doing so, right?

6    A    Yes.

7    Q    And you observed this Grace message on February 9,

8         right?

9    A    Yes.

10   Q    But there's no way for you to know the date that he

11        actually created that post, correct?

12   A    No.

13   Q    So it could have been weeks before.  You're not sure?

14   A    I'm not sure, no.

15   Q    Okay.  Because you hadn't accessed match.com for quite

16        some time, correct?

17   A    Correct.

18   Q    Or at least for a few weeks?

19   A    Yes.

20   Q    And those dates and times that you have marked on the

21        exhibits Mr. Christie showed us of Mr. Fredin's

22        match.com posts, those are the dates and times that you

23        viewed or accessed the profile, correct?

24   A    No, those are the dates that he accessed my profile.

25   Q    That he accessed your profile?

1    A    Yes.  Where it says, viewed on February 9, that means

2         that he clicked on my profile on February 9.

3    Q    Sure.  Yup.  What I am curious -- let me -- I just want

4         to make sure we're talking about the same thing.  Ms.

5         Miller, I'm showing you exhibit -- a copy of Exhibits 8

6         through 10.  Do you recognize those?

7    A    Yes.

8    Q    And you have handwritten dates and times on that,

9         correct?

10   A    Yes.

11   Q    And those handwritten notes, those are -- those notes

12        refer to when you viewed those profile postings,

13        correct?

14   A    Yes.

15   Q    Okay.  That's what I was wondering.  Thank you.

16   A    Uh-huh.

17   Q    So those dates and times on Exhibits 8 through 10 are

18        not the dates that he accessed your profile, correct?

19   A    Those -- no, not those dates, but I know that he

20        accessed my profile on the ninth.

21   Q    Yup, exactly.  Okay.  Now, you responded to his post by

22        sending him a private message on match.com, correct?

23   A    Yes.

24   Q    And the posts that we are discussing, those were posts

25        on his match.com profile page, right?

—302—

Filed in District Court
State of Minnesota
4/8/2019 4:26 PM

1   A   Yes.

2   Q   Those weren't messaged or e-mailed to you directly?

3   A   No.

4   Q   And he did not reply back to your match e-mail message,

5       correct?

6   A   Not through e-mail, no.

7   Q   And you actually messaged him that day -- or within

8       those two days two times, right?

9   A   Yes.  I messaged him the first time and then he revised

10      his profile to say more and then I messaged him again

11      and then he revised it again and then I called the

12      police.

13  Q   Yup.  And your messages to him were -- both of them, in

14      various terms, were saying, take this down?

15  A   Yes.

16  Q   And his revisions to his match.com profile were not

17      responded to you, correct?

18  A   Not directly, but I would say that they were, in a

19      sense.

20  Q   Sure, but they weren't saying, no, I won't take this

21      down, for example, correct?

22  A   No.

23  Q   He adding more information to them?

24  A   Yes.

25  Q   And even to your second message, he did not respond to

1           you via match messaging, correct?

2    A    Correct.

3    Q    And his match.com posting used your first name, Grace?

4    A    Yes.

5    Q    It didn't use your last name?

6    A    No.

7    Q    It didn't list where you lived?

8    A    No.

9    Q    Didn't list your date of birth, nothing like that,

10          right?

11   A    No.

12   Q    And you called police as a result of those match.com

13          postings, correct?

14   A    Yes.

15              MS. ZAUHAR:  Thank you.  Nothing further.

16              THE COURT:  Mr. Christie.

17              MR. CHRISTIE:  Thank you.

18                      REDIRECT EXAMINATION

19   BY MR. CHRISTIE:

20   Q    So a little bit ago, defense counsel made it clear to

21          us that you're not exactly sure when the posts were

22          placed there by Mr. Fredin on match.com to a lost love.

23          You just don't know when he put it on match.com; is

24          that right?

25   A    The first one, yes, that's correct.

—304—

62-CR-17-3156

CASE 0:19-cv-03051-SRN-HB   Document 88   Filed 04/06/20   Page 110 of 137   Filed in District Court
State of Minnesota
4/8/2019 4:26 PM



1    Q   All right.  And so -- but you've made it clear on

2         cross-examination that you know when Mr. Fredin has

3         taken some steps or had some conduct in clicking on

4         your profile; is that right?

5    A   Yes.

6    Q   And you're sure that Mr. Fredin took steps on February

7         9 to click on your profile?

8    A   Yes.  I think he did it several times.

9    Q   Okay.  And this is the badge that we're talking about?

10   A   Yeah.  The screen name, yes.

11   Q   And so match.com is set up in such a way that you may

12        not know when he posted this purported love letter, but

13        you know when he's clicked on your profile to somehow

14        knock on your door, I'm here?

15           MS. ZAUHAR:  Objection, leading.

16           THE COURT:  Overruled.

17   Q   (By Mr. Christie, continuing) You know --

18   A   Correct.

19   Q   -- when he's clicking on your profile?

20   A   Yes.

21   Q   The evening of February 10 and into the morning once

22        and twice the following day, February 10 [sic]; is that

23        correct?

24   A   Yes, the night of the tenth.

25   Q   Okay.  Now, on cross-examination, defense counsel is

1      walking you through these Facebook messages in early

2      December.  And in the beginning, they were

3      characterized as inappropriate and insulting, right?

4   A  Yes.

5   Q  Okay.  Did things get to a point in these

6      communications between December 3 and February 10 where

7      the contacts were more than just inappropriate and more

8      than just insulting, in your mind?

9   A  Yes.

10  Q  Okay.  And could you please explain that for us?

11  A  Well, I think it's invasive and scary when somebody

12     tells you you can't see other men.

13  Q  And why is it scary to you?  Why were you frightened by

14     this notion that he demanded you not see other men?

15  A  Well, it's controlling.  I don't know how else to

16     describe it.

17  Q  And that idea of his control over you seemed to be

18     central to the problems that you were having in the

19     relationship throughout that fall?

20  A  Yes.

21  Q  So you were frightened by this idea of control.  Did

22     anything else kind of develop in terms of your

23     reaction?  Did you have any worries that were weighing

24     on your mind as things were progressing throughout

25     February and January?

Filed in District Court
State of Minnesota
4/8/2019 4:26 PM

1    A    Well, I told him that he was making me uncomfortable

2         and that I was going around and checking locks on my

3         doors multiple times at night because of the way that

4         he was talking to me.

5    Q    You told him that?

6    A    Yes.

7    Q    Why would you be checking the locks on your door?

8    A    Because I didn't trust that he wouldn't just come right

9         in if he wanted to.

10   Q    Because of the way things were developing?

11   A    Yes.

12   Q    He hadn't done it before?

13   A    No.

14   Q    But things were changing?

15   A    Yes.

16   Q    Now, counsel for the defense made this point about you

17        paying extra for the invisible feature on match.com,

18        and we want to understand.  When did you purchase that

19        feature?

20   A    Right before I went and checked to see what he had

21        written on his profile.

22   Q    Okay.  Now, why would you want that invisibility, as it

23        were?

24   A    I didn't want to encourage him by making him think that

25        I was listening to what he was saying.

1    Q    You weren't trying to stalk him, were you?

2    A    No.

3    Q    Now, going back to this issue of control and how it

4         worked in your relationship, there was some reference

5         to this idea of who was the man in your relationship;

6         is that right?

7    A    Yes.

8    Q    Can you help the jury understand a little bit more of

9         that sort of theme or that discussion throughout the

10        context of your relationship with Mr. Fredin?

11   A    Sure.  I guess at times he would -- he'd kind of act, I

12        guess, oddly, like subservient, and say, I want to

13        bring you wine, don't you want wine, and what else can

14        I bring you, what can I do for you, and I remember one

15        night we were -- I think it was in October.  We were

16        carving pumpkins, and I -- mine was really neat and

17        clean.  And he said, you're really good at everything,

18        it's like you're the man in the relationship, and I

19        said, well, I didn't really like the way that that was

20        phrased, just because you're good at things doesn't

21        make you a man.  And it's like he wanted -- he wanted

22        me to be that, and he didn't know how to -- when I say

23        that I'm looking for confidence, I don't mean

24        aggression.  There's a -- there's a huge difference

25        between -- between that.  When I say, I want you to be

1      the man in the relationship, I mean kind of some

2      measure of maturity and responsibility versus I'm going

3      to tell you you can't date other men.

4   Q  So you were the one that asked him to be the man in the

5      relationship?

6   A  I can't remember if I said it that way, but yeah, yeah.

7   Q  And he's turning it around, and he's saying, I guess

8      you're the man in the relationship.  It sounds like it

9      started off like a joke?

10  A  Sort of.  I -- I didn't take it that way.  It made me a

11     little uncomfortable.  I thought it was strange.

12  Q  Was it a one-up, this joke or this idea of you're going

13     to be the man?

14  A  I don't remember him saying it as clearly as that one

15     night where he said, you're so good at everything, it's

16     like you're the man.

17  Q  Okay.  Now, did you ever express in any way to Mr.

18     Fredin that you wanted to have control over him in this

19     relationship?

20  A  No.

21  Q  Did you ever try to forbid Mr. Fredin from seeing

22     anybody else?

23  A  No.

24  Q  Did you ever try to tell Mr. Fredin what to wear?

25  A  No.

—309—

62-CR-17-3156

CASE 0:19-cv-03051-SRN-HB    Document 88    Filed 04/06/20    Page 115 of 137    Filed in District Court
State of Minnesota
4/8/2019 4:26 PM



1    Q    Did you ask Mr. Fredin ever to do you any sort of

2         romantic or sexual favors?

3    A    No.

4    Q    But yet there was this idea of who was in control in

5         this relationship; is that right?

6    A    To me, it was less a matter of someone needing to be in

7         control than just being confident and forthright and

8         seeing eye to eye.  I guess the way to describe it is

9         that I was just advocating for a sense of balance

10        versus one of us having to be the domineering person

11        and the other person being like the servile one.

12        That's not how it should work.  Both should be mature,

13        confident, and comfortable adults.

14   Q    But things went much more than that.  They went kind of

15        awry, didn't they?

16   A    Yes.

17   Q    Let's talk about the development of the communications

18        throughout January.  There was mention of the spam

19        folder.  What are some reasons why people might check

20        their spam folders on their e-mail on their computer?

21   A    Sometimes stuff gets filtered into their spam folder.

22        I check mine periodically, just scan through it, and

23        make sure there's nothing in there that shouldn't have

24        gone straight into the spam mailbox.

25   Q    And so am I to understand, then, that you periodically

—310—

1      or regularly checked your spam folder for a variety of

2      reasons?

3   A   Yeah.  If it occurs to me, I do check it, yeah.

4   Q   Not just to go fishing to see whether or not Mr. Fredin

5      sent you some errant, blocked e-mails in the middle of

6      January?

7   A   No.

8   Q   If you check your spam folder, you might find a variety

9      of things, but this time you found some e-mails from

10     Mr. Fredin?

11  A   Yes.

12  Q   You didn't like being pursued?

13  A   Not that way.

14          MR. CHRISTIE:  I have no further questions to

15     the witness.

16          THE COURT:  Ms. Zauhar.

17          MS. ZAUHAR:  Thank you.

18              RECROSS-EXAMINATION

19  BY MS. ZAUHAR:

20  Q   Ms. Miller, you just explained to Mr. Christie that Mr.

21     Fredin hadn't before tried to come right into your

22     house, correct?

23  A   Correct.

24  Q   And I just want to clarify for the jury, he never

25     attempted to subse-- or future to do that, correct?

—311—

Filed in District Court
State of Minnesota
4/8/2019 4:26 PM



```
 1    A    Correct.

 2    Q    You also explained that you purchased the invisible

 3         feature so that you could see his profile and message

 4         to you without him knowing that you were hearing it or

 5         seeing it, right?

 6    A    Yes.

 7    Q    But then you chose to message him, saying you saw it,

 8         correct?

 9    A    Yes.

10    Q    Yes?

11    A    Yes.

12    Q    And on January 24, on that specific occasion, you

13         weren't just casually perusing your spam filter,

14         correct?

15    A    Correct.

16    Q    You were looking to see if Mr. Fredin had e-mailed you,

17         right?

18    A    I -- after I got the notification, I thought, is he

19         still trying to contact me?  Yes, I went into the spam

20         folder and found the e-mails.

21              MS. ZAUHAR:  Thank you.  Nothing further.

22              THE COURT:  Very briefly, does that prompt

23         anything, Mr. Christie?

24              MR. CHRISTIE:  No, Your Honor.

25              THE COURT:  Thank you, Ms. Miller.  You are
```

—312—

1     done.  You may step down.

2               THE WITNESS:  Thank you, Your Honor.

3               MR. CHRISTIE:  May I call my next witness,

4     Your Honor?

5               THE COURT:  You certainly may.

6               MR. CHRISTIE:  May I go to the hall?

7               THE COURT:  You sure can.  Ladies and

8     gentlemen of the jury, it's appropriate to stand up and

9     stretch at this time, if you want.  The same with

10    anyone else in the courtroom.

11              (Whereupon, Mr. Christie stepped out of the

12    courtroom briefly and returned with the State's next

13    witness.)

14              THE COURT:  All right.  Thank you.

15              MR. CHRISTIE:  Your Honor, at this time, the

16    State will call to the stand Sgt. David McCabe.

17              THE COURT:  Come on up here, Sergeant.

18    Remain standing.  I'll have you sworn in.

19              THE CLERK:  Please raise your right hand.

20    You do swear or affirm that the testimony you give here

21    will be true, so help you God?

22              THE WITNESS:  I do.

23              THE COURT:  Thank you.  You may have a seat.

24    Feel free to adjust the microphone so it's appropriate

25    to your height.  I want to remind you to speak loud and

62-CR-17-3156

Filed in District Court
State of Minnesota
4/8/2019 4:26 PM

1

2    STATE OF MINNESOTA    )
                          )    SS.
3    COUNTY OF RAMSEY     )

4                    REPORTER'S CERTIFICATE

5

6        Be it known that Elisabeth Gulbranson took the

7    proceedings in the case of State of Minnesota v. Brock

8    William Fredin, on July 17, 2018, at the Ramsey County Court

9    House, St. Paul, Minnesota;

10       that the witnesses, before testifying, were first duly

11   sworn to testify to the whole truth and nothing but the

12   truth relative to said cause;

13       that the proceedings were recorded in stenotype and

14   reduced to print by means of Computer-Assisted Transcription

15   under my direction and that the transcript is a true record

16   of the proceedings, to the best of my ability;

17       that I am not related to any parties hereto nor

18   interested in the outcome of the action.

19       Dated this 3rd day of April, 2019.

20

21

22                        /s/ Patricia J. Kinning
                          _____
23                        Patricia J. Kinning
                          Official Court Reporter to the
24                        Honorable Lezlie Ott Marek
                          25 W. Seventh Street, #B404
25                        St. Paul, Minnesota 55102
                          (651) 266-8329

                                                              —342—

                    RAMSEY COUNTY DISTRICT COURT



Saint Paul Police Department

# ORIGINAL OFFENSE / INCIDENT REPORT

| Complaint Number | Reference CN | Date and Time of Report |
|---|---|---|
| 18101907 | 17280978 | 05/14/2018 23:37:00 |

Primary offense:

## FAMILY/CHILDREN-VIOLATION OF RESTRAINING ORDER

| | |
|---|---|
| Primary Reporting Officer: Filosa, David | Name of location/business: |
| Primary squad: 181 | Location of incident: 1656 DAYTON AV Apt Lower |
| Secondary reporting officer: Kinsel, Michael | ST PAUL, MN 55104 |
| Approver: Dunaski, Michael | |
| District: Western | Date & time of occurrence: 05/14/2018 16:00:00 to |
| Site: | 05/14/2018 21:03:00 |

Arrest made:

Secondary offense:

Police Officer Assaulted or Injured:

Crime Scene Processed: Yes

Police Officer Assisted Suicide:

## OFFENSE DETAILS

### FAMILY/CHILDREN-VIOLATION OF RESTRAINING ORDER

Attempt Only:

Appears to be Gang Related:

**Crime Scene**

**Method & Point of Entry**

Type: Residential prop, occup

Force used:

Hid Inside:

Description: Multi, Apartments

Point of entry:

Method:

**Victims**

Miller, Grace Elizabeth

## NAMES

| **Suspect** | Fredin, Brock William |
|---|---|
| | 1905 IRIS BAY ST |
| **KNOWN** | HUDSON, WI 54016 |

**Nicknames or Aliases**

Nick Name:

Alias:

AKA First Name:

AKA Last Name:

**Details**

| Sex: Male | Race: White | DOB: 12/12/1983 | Resident Status: |
|---|---|---|---|
| | Hispanic: | Age: 34   from   to | |

SP0000026EC6050B

Saint Paul Police Department

# ORIGINAL OFFENSE / INCIDENT REPORT

| *Complaint Number* | *Reference CN* | | *Date and Time of Report* |
|---|---|---|---|
| 18101907 | 17280978 | | 05/14/2018 23:37:00 |

*Primary offense:*

## FAMILY/CHILDREN-VIOLATION OF RESTRAINING ORDER

---

**Phones**

| Home: | Cell: | Contact: |
|---|---|---|
| Work: | Fax: | Pager: |

**Employment**

| Occupation: | Employer: |
|---|---|

**Identification**

| SSN: | License or ID#: | License State: |
|---|---|---|

**Physical Description**

| US: | Metric: | | |
|---|---|---|---|
| Height: | to | Build: | Hair Length: | Hair Color: |
| Weight: | to | Skin: | Facial Hair: | Hair Type: |
| Teeth: | Eye Color: | Blood Type: | |

**Offender Information**

| Arrested: | No | Pursuit engaged: | Violated Restraining Order: |
|---|---|---|---|
| DUI: | . | Resistance encountered: | |
| Condition: | | | |
| | Taken to health care facility: | | Medical release obtained: |

---

**Victim**

Miller, Grace Elizabeth
1656 DAYTON AV Apt LOWER
ST PAUL, MN 55104

**Nicknames or Aliases**

| Nick Name: | |
|---|---|
| Alias: | |
| AKA First Name: | AKA Last Name: |

**Details**

| Sex: Female | Race: White | DOB: 8/16/1984 | | Resident Status: |
|---|---|---|---|---|
| | Hispanic: | Age: 33 | from | to |

**Phones**

| Home: | Cell: 507-450-4243 | Contact: |
|---|---|---|
| Work: | Fax: | Pager: |

**Employment**

| Occupation: | Employer: |
|---|---|

SP0000026EC6050B

Saint Paul Police Department

# ORIGINAL OFFENSE / INCIDENT REPORT

| Complaint Number | Reference CN | Date and Time of Report |
|---|---|---|
| 18101907 | 17280978 | 05/14/2018 23:37:00 |

Primary offense:

## FAMILY/CHILDREN-VIOLATION OF RESTRAINING ORDER

**Identification**

| SSN: | License or ID#: | License State: |
|---|---|---|

**Physical Description**

| US: No | Metric: No | | |
|---|---|---|---|
| Height:         to | Build: | Hair Length: | Hair Color: |
| Weight:         to | Skin: | Facial Hair: | Hair Type: |
| Teeth: | Eye Color: | Blood Type: | |

**Victim Information**

| Type: Individual | Can Identify Offender:  Yes | Willing to Press Charges: Yes |
|---|---|---|
| Condition: | | |
| | Taken to health care facility: No | Medical release obtained:  No |

**Relationships**

| Acquaintance | Suspect | Fredin, Brock William |
|---|---|---|

## SOLVABILITY FACTORS

| Suspect can be Identified: | By: |
|---|---|
| Photos Taken: Yes | Stolen Property Traceable: |
| Evidence Turned In: Yes | Property Turned In: |
| Related Incident: | |

**Lab**

| Biological Analysis: | Fingerprints Taken: |
|---|---|
| Narcotic Analysis: | Items Fingerprinted: |
| Lab Comments: | |

## Participants:

| Person Type: | Name: | Address: | Phone: |
|---|---|---|---|
| Suspect | Fredin, Brock William | 1905 IRIS BAY ST<br>HUDSON, WI 54016 | |
| Victim | Miller, Grace Elizabeth | 1656 DAYTON AV Apt LOWER<br>ST PAUL, MN 55104 | |

## NARRATIVE

NO ICC AVAILABLE.  BWC AVAILABLE, FILOSA/KINSEL.

On 05/14/2018 at 1955 hours, We, Sqd 181 (FILOSA/KINSEL), responded to 1656 DAYTON AVE LOWER LEVEL on a violation of a restraining order.

SP0000026EC6050B

Page   4

Saint Paul Police Department

# ORIGINAL OFFENSE / INCIDENT REPORT

| Complaint Number | Reference CN | Date and Time of Report |
|---|---|---|
| 18101907 | 17280978 | 05/14/2018 23:37:00 |

Primary offense:

## FAMILY/CHILDREN-VIOLATION OF RESTRAINING ORDER

I am issued a body camera, I have been trained in its use and I wear it as part of my uniform. I mount it in the middle of my chest mounted to my uniform jacket. While driving to the call, I turned the camera on. It remained on throughout this call. I have not reviewed the footage but may do so at a later date. After reviewing the footage, I may write a supplement report to clarify any facts, add more detail or other relevant information.

Upon arrival, we met with the complainant who we identified as GRACE ELIZABETH MILLER (DOB: 08/16/1984, 1656 DAYTON AVE LOWER LEVEL, ST. PAUL, 55104, CELL/P: 507-450-4243). MILLER said she had been involved in ongoing harassment from a male who she identified as BROCK WILLIAM FREDIN (DOB: 12/12/1983).

MILLER showed us printed copies of a harassment order from Ramsey County (Court File #62-HR-CV-18-202) signed by Judge Patrick Diamond. The Order, dated 04/09/2018, stated that the "Respondent shall not directly or indirectly create, post, place, or distribute online any content that has a substantial adverse effect on the safety, security, or privacy of Petitioner."

We confirmed with Data/Ch.5 that the Court File number and Restraining Order was still in effect as of that day, 05/14/2018.

MILLER showed us her laptop screen where she found that the Respondent FREDIN had posted on his Twitter account a Tweet that stated, "...claimed Grace Elizabeth Miller 'is a bitch'.." The Tweet was in the context of a greater set of Tweets naming numerous other people.

I took photos of the Twitter page showing the context of the Tweet and uploaded those to the Media Vault.

MILLER was visibly upset with the ongoing case against FREDIN.

END OF REPORT.

## PUBLIC NARRATIVE

On 05/14/2018 at 1955 hours, Officers responded to the 1600 block of Dayton Ave on a violation of a restraining order. A female said a male violated a restraining order by posting comments about her on the Internet. There were no injuries. No arrests were made.

Last page of the report

Page   1

Saint Paul Police Department

# SUPPLEMENTAL OFFENSE / INCIDENT REPORT

Complaint Number          Reference CN                                              Date and Time of Report

18101907        17280978                                          05/15/2018 07:07:00

Primary offense:

## FAMILY/CHILDREN-VIOLATION OF RESTRAINING ORDER

| | |
|---|---|
| Primary Reporting Officer:  Welters, Matthew | Name of location/business: |
| Primary squad: | Location of incident: 1656 DAYTON AV Apt Lower |
| Secondary reporting officer: | ST PAUL, MN 55104 |
| Approver: | |
| District: Western | Date & time of occurrence:  05/14/2018 16:00:00 to |
| Site: | 05/14/2018 21:03:00 |

Arrest made:

Secondary offense:

Police Officer Assaulted or Injured:                    Police Officer Assisted Suicide:

Crime Scene Processed:

## NARRATIVE

I, Officer Welters - St. Paul Police Family Violence Unit, reviewed the criminal history for FREDIN, BROCK WILLIAM 12/12/1983.  I used MNCIS and the MNBCA Public site to conduct the check.  I found no QDVRO convictions.

## PUBLIC NARRATIVE

Last page of the report

SP0000026EC6050B

Page   1

Saint Paul Police Department

# SUPPLEMENTAL OFFENSE / INCIDENT REPORT

| Complaint Number | Reference CN | Date and Time of Report |
|---|---|---|
| 18101907 | 17280978 | 05/23/2018 10:00:00 |

Primary offense:

## FAMILY/CHILDREN-VIOLATION OF RESTRAINING ORDER

| | |
|---|---|
| Primary Reporting Officer:  Nasset, Sarah E | Name of location/business: |
| Primary squad: | Location of incident: 1656 DAYTON AV Apt Lower |
| Secondary reporting officer: | ST PAUL, MN 55104 |
| Approver: | |
| District: Western | Date & time of occurrence:  05/14/2018 16:00:00 to |
| Site: | 05/14/2018 21:03:00 |

Arrest made:

Secondary offense:

Police Officer Assaulted or Injured:                    Police Officer Assisted Suicide:

Crime Scene Processed:

## NARRATIVE

On May 21, 2018, I received a call from the victim, Miller, about another possible violation of her order. Miller stated she was searching the suspect's Tweeter account and found more posts that were posted under the suspect's account.

I told Miller that if she forwarded the information to my work email I would add the information to the case.

On May 5, 2018 at 1454 hours and 17 00 hours I received two emails from Miller.

The first email included a screen shot of the Tweeter account under "Brock Fredin@Brock_Fredin" with the suspect's photo.  There were three tweets. In the tweets it stated the suspect was going to live stream about his Second Amended Complaint and how he was going to stop an autistic U.S. Attorney, Rhode scholar instructor and a commander of a military base. The suspect may be the first person to get an IIED claim past a motion to dismiss for a social media campaign, he can't get a gag order lifted in a corrupt family court and how tabloid coverage destroy his professional livelihood.

The second email included a screen shot and an audio recording. Per the victim, she found the recording on the website, karmenmcquitty.net. I checked the website and found the recording. The website was labeled, "Attorney Karmen McQuitty-Fraudster, Perpetuator of Nonesense". Miller stated the recording was secretly recorded during a court hearing on January 8, 2018, when her attorney, Miss McQuitty, was explaining to the court about a HRO violation the suspect had been arrested for by a Ramsey County Deputy in the court house against another victim. The victim said she was not present for her hearing on January 8, 2018.

I took a screen shot of the first page showing the website karmenmcquitty.net and the page were the recording was located. I transferred the screen shots into the Media Vault.

I transferred the two emails that included the screen shots of the tweets, the audio recording and the screen shot taken by the victim showing the location of the recording within the karmenmcquitty.net website.

SP0000026EC6050B

Saint Paul Police Department
# SUPPLEMENTAL OFFENSE / INCIDENT REPORT

*Complaint Number*      *Reference CN*

18101907       17280978

*Primary offense:*

FAMILY/CHILDREN-VIOLATION OF RESTRAINING ORDER

*Date and Time of Report*

05/23/2018 10:00:00

**PUBLIC NARRATIVE**

Last page of the report

SP0000026EC6050B

Saint Paul Police Department

# SUPPLEMENTAL OFFENSE / INCIDENT REPORT

| Complaint Number | Reference CN | Date and Time of Report |
|---|---|---|
| 18101907 | 17280978 | 10/24/2018 09:57:00 |

Primary offense:

## FAMILY/CHILDREN-VIOLATION OF RESTRAINING ORDER

Primary Reporting Officer:  Riley, John J

Primary squad:

Secondary reporting officer:

Approver:

District: Western

Site:

Name of location/business:

Location of incident: 1656 DAYTON AV Apt Lower

ST PAUL, MN 55104

Date & time of occurrence: 05/14/2018 16:00:00 to

05/14/2018 21:03:00

Arrest made:

Secondary offense:

Police Officer Assaulted or Injured:

Crime Scene Processed:

Police Officer Assisted Suicide:

## NARRATIVE

Assistant City Attorney T.Patet reviewed the case and declined charges against B. Fredin.  He was charged and  convicted on several other consolidated cases.  The victims were notified of the  result.

## PUBLIC NARRATIVE

Last page of the report

SP0000026EC6050B

Saint Paul Police Department

# ORIGINAL OFFENSE / INCIDENT REPORT

| | | |
|---|---|---|
| *Complaint Number* | *Reference CN* | *Date and Time of Report* |
| 19132719 | | 06/20/2019 14:09:00 |

Primary offense:

## FAMILY/CHILDREN-VIOLATION OF RESTRAINING ORDER

| | |
|---|---|
| *Primary Reporting Officer:* Xiong, Xai | *Name of location/business:* |
| *Primary squad:* 134 | *Location of incident:* 1656 DAYTON AV |
| *Secondary reporting officer:* | ST PAUL, MN 55104 |
| *Approver:* Mack, Daniel | |
| *District:* Western | *Date & time of occurrence:* 06/20/2019 09:00:00 *to* |
| *Site:* | 06/20/2019 10:00:00 |

*Arrest made:*

*Secondary offense:*

*Police Officer Assaulted or Injured:*          *Police Officer Assisted Suicide:*
*Crime Scene Processed:* No

## OFFENSE DETAILS

### FAMILY/CHILDREN-VIOLATION OF RESTRAINING ORDER

*Attempt Only:*          *Appears to be Gang Related:*

*Victims*

Miller, Grace Elizabeth

## NAMES

**Suspect**          Fredin, Brock William

**KNOWN**          ST PAUL, MN

*Nicknames or Aliases*

Nick Name:

Alias:

AKA First Name:          *AKA Last Name:*

*Details*

| | | | | |
|---|---|---|---|---|
| *Sex:* Male | *Race:* White | *DOB:* 12/12/1983 | | *Resident Status:* |
| | *Hispanic:* | *Age:* 35 | *from*          *to* | |

*Phones*

| | | |
|---|---|---|
| Home: | Cell: | *Contact:* |
| Work: | Fax: | *Pager:* |

*Employment*

Occupation:          *Employer:*

SP0000026EC6050B

## Saint Paul Police Department

# ORIGINAL OFFENSE / INCIDENT REPORT

| | | |
|---|---|---|
| *Complaint Number* | *Reference CN* | *Date and Time of Report* |
| 19132719 | | 06/20/2019 14:09:00 |

*Primary offense:*

## FAMILY/CHILDREN-VIOLATION OF RESTRAINING ORDER

---

*Identification*

| SSN: | License or ID#: | License State: |
|---|---|---|

*Physical Description*

| US: | Metric: | | |
|---|---|---|---|
| Height: to | Build: | Hair Length: | Hair Color: |
| Weight: to | Skin: | Facial Hair: | Hair Type: |
| Teeth: | Eye Color: | Blood Type: | |

*Offender Information*

| Arrested: | Pursuit engaged: | Violated Restraining Order: |
|---|---|---|
| DUI: | Resistance encountered: | |
| Condition: | | |
| | Taken to health care facility: | Medical release obtained: |

**Victim**

Miller, Grace Elizabeth
1656 DAYTON AV
ST PAUL, MN 55104

*Nicknames or Aliases*

| Nick Name: | |
|---|---|
| Alias: | |
| AKA First Name: | AKA Last Name: |

*Details*

| Sex: Female | Race: White | DOB: 8/16/1984 | Resident Status: |
|---|---|---|---|
| | Hispanic: | Age: 34   from   to | |

*Phones*

| Home: | Cell: 507-450-4243 | Contact: |
|---|---|---|
| Work: | Fax: | Pager: |

*Employment*

| Occupation: | Employer: |
|---|---|

*Identification*

| SSN: | License or ID#: | License State: |
|---|---|---|

*Physical Description*

| US: No | Metric: No | | |
|---|---|---|---|
| Height: to | Build: | Hair Length: | Hair Color: |
| Weight: to | Skin: | Facial Hair: | Hair Type: |
| Teeth: | Eye Color: | Blood Type: | |

SP0000026EC6050B

Saint Paul Police Department

# ORIGINAL OFFENSE / INCIDENT REPORT

Complaint Number     Reference CN                                   Date and Time of Report

**19132719**                                           06/20/2019 14:09:00

Primary offense:

## FAMILY/CHILDREN-VIOLATION OF RESTRAINING ORDER

| Victim Information | | | |
|---|---|---|---|
| Type: Individual | Can Identify Offender: Yes | | Willing to Press Charges: Yes |
| Condition: | | | |
| | Taken to health care facility: No | | Medical release obtained: No |

| Relationships | | | |
|---|---|---|---|
| Boy/Girl Friend | Suspect | Fredin, Brock William | |

## SOLVABILITY FACTORS

Suspect can be Identified: Yes                             By: GRACE MILLER

Photos Taken:                   Stolen Property Traceable:

Evidence Turned In:                Property Turned In:

Related Incident:

Lab

Biological Analysis:               Fingerprints Taken:

Narcotic Analysis:               Items Fingerprinted:

Lab Comments:

## Participants:

| Person Type: | Name: | Address: | Phone: |
|---|---|---|---|
| Suspect | Fredin, Brock William | ST PAUL, MN | |
| Victim | Miller, Grace Elizabeth | 1656 DAYTON AV ST PAUL, MN 55104 | |

## NARRATIVE

NO ICC SQUAD 1489

BWC ACTIVATED - X. XIONG
BWC NOT REVIEWED PRIOR TO REPORT

On 06/20/19 at approximately 1241 hours, I, Officer X. Xiong (Squad 134) was sent to 1656 Dayton Ave on a VOP call.

Upon arrival, I spoke with the complainant who later identified herself as GRACE ELIZABETH MILLER (DOB: 08/16/84, 1656 DAYTON AVE, C#: 507-450-4243). MILLER said that her ex-boyfriend, BROCK WILLIAM FREDIN (DOB: 12/12/83, NPA), just got out of jail on June 12th, 2019. MILLER said that today 06/20/19 she found two new meme's about her on the internet. MILLER said that she stopped finding stuff about her on internet when FREDIN was booked for 8 months for violating an OFP.

SP0000026EC6050B

Saint Paul Police Department

# ORIGINAL OFFENSE / INCIDENT REPORT

| | | |
|---|---|---|
| *Complaint Number* | *Reference CN* | *Date and Time of Report* |
| 19132719 | | 06/20/2019 14:09:00 |

*Primary offense:*

## FAMILY/CHILDREN-VIOLATION OF RESTRAINING ORDER

MILLER said she is positive that FREDIN has created the new meme's about her because she has not found anything recently until his release. MILLER said FREDIN was in violation of the new and old OFP (62-HR-CV-16-46 / 62-HR-CV-18-202) that was put against him. MILLER said that in the past, FREDIN had also created websites and meme's about her that violated the OFP.

MILLER was read the Domestic blueprint assessment questions. MILLER said she does not know if FREDIN will seriously injure or kill her. MILLER said that FREDIN threatens her everyday because she does not know if he will put her name on the internet again. MILLER said that it has not changed because it has been the same for three years. MILLER said that she is always afraid of FREDIN because of what he has done to her. MILLER said she always has to look out in case FREDIN is nearby. MILLER said if we cannot contact her, we can contact her dad, WILLIAM MILLER (C#: 612-708-9630). MILLER said that FREDIN has live in numerous areas in Saint Paul, MN and Hudson, WI in the past 10 years.

MILLER was given a business card and case number.

I uploaded the MEME's into the media vault and turned in MILLER's victim impact statement at the SPPD Western District drop box.

No further information at this time.

## PUBLIC NARRATIVE

On 06/20/19, Officers were sent to 1656 Dayton Ave on a VOP call. Upon arrival, Officers spoke with the complainant who stated that her ex-boyfriend had violated a protection order by making meme's about her.

Last page of the report

SP0000026EC6050B

Saint Paul Police Department
# SUPPLEMENTAL PROPERTY REPORT

| Complaint Number | Reference CN | Date and Time of Report |
|---|---|---|
| 19132719 | | 06/20/2019 15:40:00 |

Primary offense:

## FAMILY/CHILDREN-VIOLATION OF RESTRAINING ORDER

| | | |
|---|---|---|
| Primary Reporting Officer: Xiong, Xai | | Name of location/business: |
| Primary squad: | | Location of incident: 1656 DAYTON AV |
| Secondary reporting officer: | | ST PAUL, |
| Approver: | | |
| District: | | Date & time of occurrence: 06/20/2019 12:45:00 to |
| Site: | | 06/20/2019 12:45:00 |

Arrest made:

Secondary offense:

Police Officer Assaulted or Injured:            Police Officer Assisted Suicide:
Crime Scene Processed:

## OFFENSE DETAILS

### FAMILY/CHILDREN-VIOLATION OF RESTRAINING ORDER

Attempt Only:                         Appears to be Gang Related:

## NAMES

### Owner

**Nicknames or Aliases**

Nick Name:

Alias:

AKA First Name:                    AKA Last Name:

**Details**

| Sex: | Race: | DOB: | Resident Status: |
|---|---|---|---|
| | Hispanic: | Age: | from | to |

**Phones**

| Home: | Cell: | Contact: |
|---|---|---|
| Work: | Fax: | Pager: |

**Employment**

Occupation:                         Employer:

SP0000026EC6050B

Page   2

Saint Paul Police Department

# SUPPLEMENTAL PROPERTY REPORT

| Complaint Number | Reference CN | Date and Time of Report |
|---|---|---|
| 19132719 | | 06/20/2019 15:40:00 |

Primary offense:

## FAMILY/CHILDREN-VIOLATION OF RESTRAINING ORDER

| *Identification* | | |
|---|---|---|
| SSN: | License or ID#: | License State: |

## PROPERTY

ITEM #  1

| Type of Loss: Recovered | Date of Loss: | Location Lost: |
|---|---|---|
| Owner: | Date Recovered: 6/20/2019 | Location Recovered: |
| Model #: | Quantity: | Serial #: |

Article Type / Item:  Other property        /  Miscellaneous items          Total value: $0.00

Description:  victim impact statement

| Turned in at: | Locker ID #: | Lab exams: |
|---|---|---|

## NARRATIVE

Items:
1    Other property      Miscellaneous items      victim impact statement      $ 0.00

## PUBLIC NARRATIVE

Last page of the report

SP0000026EC6050B

Saint Paul Police Department

# SUPPLEMENTAL OFFENSE / INCIDENT REPORT

*Complaint Number*        *Reference CN*

19132719

*Primary offense:*

*Date and Time of Report*

06/21/2019 07:07:00

## FAMILY/CHILDREN-VIOLATION OF RESTRAINING ORDER

*Primary Reporting Officer:*  Welters, Matthew

*Primary squad:*

*Secondary reporting officer:*

*Approver:*

*District:* Western

*Site:*

*Name of location/business:*

*Location of incident:* 1656 DAYTON AV

ST PAUL, MN 55104

*Date & time of occurrence:* 06/20/2019 09:00:00 *to*

06/20/2019 10:00:00

*Arrest made:*

*Secondary offense:*

*Police Officer Assaulted or Injured:*

*Crime Scene Processed:*

*Police Officer Assisted Suicide:*

## NARRATIVE

I, Officer Welters - St. Paul Police Family Violence Unit, reviewed the criminal history for FREDIN, BROCK WILLIAM 12/12/1983.  I used MNCIS and MNBCA Public site to conduct the check.  I found the following QDVRO conviction:

1- 10/17/2018 - Stalking (GM) - Ramsey County, 62-CR-17-3156
2- 04/30/2019 - Violate Harassment Restraining Order (M) - Ramsey County, 62-CR-18-157

## PUBLIC NARRATIVE

Last page of the report

SP0000026EC6050B

Page   1

## Saint Paul Police Department
# SUPPLEMENTAL OFFENSE / INCIDENT REPORT

| | |
|---|---|
| *Complaint Number*    *Reference CN* | *Date and Time of Report* |
| 19132719 | 06/24/2019 14:15:00 |

*Primary offense:*

## FAMILY/CHILDREN-VIOLATION OF RESTRAINING ORDER

| | |
|---|---|
| *Primary Reporting Officer:*  Riley, John J | *Name of location/business:* |
| *Primary squad:* | *Location of incident:* 1656 DAYTON AV |
| *Secondary reporting officer:* | ST PAUL, MN 55104 |
| *Approver:* | |
| *District:* Western | *Date & time of occurrence:*  06/20/2019 09:00:00 *to* |
| *Site:* | 06/20/2019 10:00:00 |
| *Arrest made:* | |
| *Secondary offense:* | |

| | |
|---|---|
| *Police Officer Assaulted or Injured:* | *Police Officer Assisted Suicide:* |
| *Crime Scene Processed:* | |

## NARRATIVE

On 06/24/2019 I, Sgt. John Riley of FVU, presented the case to the County Attorney's Office for charging consideration (pre-screening).

After Review, Assistant City Attorney S. Pfaffe declined charges.

## PUBLIC NARRATIVE

Last page of the report

SP0000026EC6050B

Saint Paul Police Department

# SUPPLEMENTAL OFFENSE / INCIDENT REPORT

| Complaint Number | Reference CN | | Date and Time of Report |
|---|---|---|---|
| 19132719 | | | 06/24/2019 14:37:00 |

Primary offense:

## FAMILY/CHILDREN-VIOLATION OF RESTRAINING ORDER

| | | |
|---|---|---|
| Primary Reporting Officer: Riley, John J | Name of location/business: | |
| Primary squad: | Location of incident: 1656 DAYTON AV | |
| Secondary reporting officer: | ST PAUL, MN 55104 | |
| Approver: | | |
| District: Western | Date & time of occurrence: 06/20/2019 09:00:00 to | |
| Site: | 06/20/2019 10:00:00 | |

Arrest made:

Secondary offense:

Police Officer Assaulted or Injured:
Crime Scene Processed:

Police Officer Assisted Suicide:

## NARRATIVE

On 06/24/2019 I, Sgt. John  Riley of FVU, spoke with Grace MIller to advise her the County Attorney's Office declination of charges.  Initially, Ms. Miller was upset.

Later, Miller told me she discovered the memes reported in this case were approximately 2 years old.

## PUBLIC NARRATIVE

Last page of the report

SP0000026EC6050B